#### AND

## *THE CORRECTION OF ERRORS*

#### OF THE

## STATE OF NEW-YORK;

#### IN FEBRUARY, MARCH, AND APRIL, 1823.

---

JAMES GOODELL, Plaintiff in Error,
*against*
JAMES JACKSON, *ex dem.* PETER SMITH, Defendant in Error.

IN ERROR to the Supreme Court. *Vide*, S. C. *ante* p. 188—194.

*Storrs*, for the plaintiff in error, contended, 1. That *William Sagoharase*, the *Indian*, the grantor of the plaintiff's lessor, not being a citizen of the state, could not take lands by descent, as heir to his father, *John S.*, the *Indian* patentee of the lot in question; and, of course, could not convey a title to the lessor of the plaintiff. If the *Indians* in this state are *citizens*, according to the doctrine laid down by the Supreme Court, then they are citizens also of the *United* equivalent to a legislative grant to *J. S.*, and his *Indian* heirs.

A patent for land to *J. S.*, an *Oneida Indian*, and his heirs and assigns, forever, is to him and his *Indian* heirs, whatever their civil condition and character may be, whether aliens or citizens.

Such a patent is to be taken as issued by due authority, and as

The *Indians* within this state, are not *citizens;* but are distinct tribes or nations, living under the protection of the government.

No white person can lawfully purchase any right or title to land from any *Indian* or *Indians*, without the authority and consent of the legislature.

A deed, therefore, executed in 1797, by the son and heir of *J. S.*, an *Indian* patentee of land, to a citizen, in the usual form, without any such consent, is illegal and void.

VOL. XX.                      88

IN ERROR.
.......
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

*States;* and, it would follow, that all *Indians* within the *United States* were citizens. It is not enough for the counsel for the defendant in error to show, that *Indians* are not *aliens,* in every sense of the term; but they must show, that they have a legal capacity to inherit, or take land by descent. If *John S.* was not a citizen in 1783, it must be shown at what time, in what manner, and by what act, his son, *W. S.,* became a citizen. These *Indian* tribes have never been treated, nor considered, by the government of the *United States,* as citizens. The question is, not whether they reside within our territory or jurisdiction; but whether they form a part of the *body politic,* or *people* of the state. The words " people," and " citizens," in their political sense, are synonymous. (7 *Mass. Rep.* 525.) *Indians* are not, therefore, comprehended either in our constitution or laws. The *United States* have made various *treaties* with the *Indians* residing within this state, the articles of which are totally repugnant to the idea of their being citizens. (*Laws of U. S.* Vol. 1. p. 307. 309. 323. 377. 379. 384. 424.) So, the explanatory article of the 4th of *May,* 1796, to the third article of the treaty of 19th of *November,* 1794, between *Great Britain* and the *United States,* recognises and considers the *Indians* as independent, and distinct from citizens. We do not enforce our rights against the *Indians* by process of law, but by arms.

Again; by the statutes of the state, *Indians* are regarded in the same character. (2 *N. R. L.* 153. sess. 36. ch. 92.) All contracts with them relative to their lands, under any pretext or colour of right whatsoever, are prohibited. No person can sue or maintain any action against any *Indian;* nor can any *Indian* sue in our Courts, unless by an attorney appointed in the manner prescribed by the act. (14 *Johns. Rep.* 335. 19 *Johns. Rep.* 127.) Now, if these *Indians* are *citizens,* all these statutes, being repugnant to the constitution of the *United States,* as well as to natural right, are void. By the several treaties of 1785, 1788, and 1810, to be found in the office of the Secretary of State, (*Book of Treaties,* 147. 150.) made with the *Oneida Indians,* they are declared to be the sole and absolute proprietors of their lands. By the 37th article of the former constitution of the

IN ERROR.

ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

state, no purchases or contracts for the sale of lands, made since the 14th of *October*, 1775, or thereafter to be made, with *Indians*, within this state, shall be deemed binding on them, or valid, without the consent of the legislature. These *Indians* have received no patent or grant for their lands, either from *Great Britain*, or from this government. By what right, then, do they hold their lands ? Clearly, by the law of nations, as independent tribes. In the case of *Jackson, ex dem. Klock*, v. *Hudson*, (3 *Johns. Rep.* 375.) it is assumed, as an undoubted and notorious fact, that the *Mohawk Indians* possessed their lands as an independent nation. By the 55th section of the act, (sess. 36. ch. 92. 2 *N. R. L.* 153. 175.) it is declared, that the heirs of each of the *Indians* to whom land has been granted by this state for military services, &c. shall be, and are thereby made capable of taking and holding any such lands, by descent, *in the same manner as if such heirs were citizens of this state*, at the death of his, her, or their ancestors. This is a most explicit legislative declaration, that these *Indians* are not citizens. The declaratory act of the last session, (sess. 45. ch. 204.) is a legal truism, for it never could be doubted, that the jurisdiction of our Courts was co-extensive with the jurisdiction of the state.

In *Calvin's* case, (7 *Co.* 1. 35. 47.) Lord *Coke*, in stating the incidents, or requisites, to make a natural *born subject*, says, that the parents must be under the actual *obedience* of the king. A child born of an *enemy* in *England*, is not a subject of the king ; for he cannot be a subject, " unless, at the time of his birth, he was under the *ligeance and obedience of the king*." Now, these *Indians* were never under *obedience* to the government of the state. They could not be taxed, nor could military services be required of them. Have they ever consented to assume the obligations of our laws ? The bonds of civil and social relation formed among them, by their condition and customs, would be destroyed by our laws. *Vattel* (Book 1. ch. 1. s. 4, 5.) says, that a weak state, which has bound itself by *unequal alliance* to a more powerful one, under whose protection it has placed itself for safety, does not, therefore, cease to be a sovereign state, acknowledging no law but

IN ERROR.
·······
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

that of nations.   These *Indian* tribes or nations, have form-ed such *unequal alliances* with our government.   Their con-dition is somewhat analogous to that of the *allies* or *friends* of ancient *Rome*.   Our commissioners, in negotiating the treaty of *Ghent*, in which the case of the *Indians* within the *United States* was much discussed, said nothing from which it can be inferred, that these *Indians* were not con-sidered by us as independent.   They merely contended, that *Great Britain* was estopped from treating them as in-dependent nations, within our territory.   But the act of the 18th of *March*, 1788, (sess. 11. ch. 85. 2 *Greenl.* ed. *Laws*, 194.) is conclusive on this subject.   Though the *pre-amble* speaks only of *Indians*, yet, the first enacting clause prohibits any contract for the purchase of lands, with any *Indian* or *Indians*, without the consent of the legislature. The enacting clause of a statute may be broader than the preamble.   (*W. Jones's Rep.* 164.   8 *Mod.* 144.   1 *P. Wms.* 520.   3 *Atk.* 204.)   The act extends as well to *indi-vidual Indians*, as to tribes of *Indians*, in their natural capa-city, as being within the mischief which the statute intended to remedy.   This statute was re-enacted without the pre-amble, in 1801, (1 *Kent & Radcl.* ed. *Laws*, p. 464. sess. 24. ch. 97.) and the meaning of the revised act is precisely the same as that of the original statute.   (4 *Mass. Rep.* 470.   *Plowd.* 86.)   The word " *Indian*," cannot be re-jected as unmeaning.   If individual *Indians* could convey their lands, the statute would be a dead letter.   (*Bac. Abr.* tit. stat. I. 2.   *Vin. Abr.* tit. stat. E. 6. pl. 100, 101. *Cowp.* 543.)

The case of *Jackson, ex dem. Gilbert*, v. *Wood*, (7 *Johns. Rep.* 290.) was decided on the statute of the 18th of *March*, 1788, not on the revised act of 1801, as was erroneously supposed, in the case of *Jackson* v. *Sharp*, (14 *Johns. Rep.* 472. 475.)

*D. Cady*, and *Talcot*, (A. G.) contra, contended, 1. That the patent to *J. S.* purported to convey, and would have conveyed to him, had he been living, an estate, transmissible by descent as well as by purchase ; and, as by the statute, the patent relates back to the time of his death, and the

IN ERROR.
........
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

estate is to be deemed vested at that time, the fact of his dying can make no difference, and his son, who conveyed to the lessor, being his heir at law, was capable of taking by descent, though he was an *Oneida Indian*, and residing with his tribe. Where the question of citizenship is doubtful, it ought to be construed in favour of the person claiming the rights of a citizen. . The principle of the common law, by which it is attempted to defeat the title derived from the *Indian* grantor, is barbarous. (*Vattel*, B. 2. ch. 8. s. 112.) It is for the plaintiff, who denies the citizenship of the *Indian* grantor, to show to what sovereign he belongs. These *Indians* were the mere children of nature, attached to no sovereign ; but, according to the maxims of the common law, they became citizens of the state at the time of the formation and establishment of its government. If we look to the records and acts of the colonial government, we shall find, that the *Indians* were then considered as *subjects* of the king of *England*. (*Minutes of the Governor and Council, in the Secretary's office,* Vol. 3., Vol. 5., and Vol. 6., in 1670, 1676, 1683, 1684, 1686, 1675, 1705, 1711, 1721, 1722.) In 1727, in the volume of commissions, Mr. *Livingston* is described as *agent*, &c., for the *Indians, our subjects,* &c. Could the king, afterwards, deny that the *Indians* were his subjects ? Laws were passed in 1700, and 1744, for their protection. (*Colden's Hist. Five Nations. 15th Article Treaty of Utrecht.*) On the 16th of *July*, 1776, the Convention of the state established a rule, by which it was to be ascertained who were to be considered as citizens. They resolved, " that all persons abiding within the state of *New-York,* and deriving protection from its laws, owe allegiance to the said laws, and are members of the state ;" and this resolution was confirmed by the constitution, afterwards formed and established. There is no exception. Every man, including the *Indians,* within the limits of the state, who were subjects of the king of *England,* became citizens, at the revolution, in 1776 ; and by the 35th article of the constitution, which makes all persons, born after, citizens. The *Indians* resisted the same sovereign, changed their allegiance at the same time, and became citizens with us. The only distinction in regard to them, was between those who joined the

IN ERROR.
.......
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

forces of the state, and those who joined the royal army, in the revolutionary war. The honour of the government demands, that those *Indians* who fought in the ranks of our army, and assisted in securing our independence, should be admitted to all the rights of citizenship. If the father was a citizen, his son, also, born in this state, must be a citizen. (*Co. Litt.* 128 *b.* 129 *a.* 7 *Co.* 18 *a. Viner's Abr.* tit. *Alien.* 9 *Mass. Rep.* 377. 454.) The common law doctrine, that an alien cannot take by descent, applies only to persons who are aliens in *every sense.* It is a doctrine of the common law, (1 *Black. Com.* 371.) that an *alien* cannot purchase land ; but does this apply to a grant or patent of land from the government, as a reward for public services ? It is owing allegiance to some other sovereign that characterizes an *alien.* By *obedience,* is meant, not *actual* obedience, but that which is due from the citizen or subject. (1 *Black. Com.* 373. *Calvin's* case, 7 *Co.*) Would the *Roman* senate have listened to an argument, that a barbarian warrior, enrolled in one of their legions, was not a citizen ? In *Virginia,* an act was passed, prohibiting *Indians* from holding civil offices. (3 *Hen. & Munf. Statutes,* 250, 251.) This shows, that they were not considered as aliens. The constitution of the *United States,* in apportioning the representatives of the *people,* excludes *Indians* not taxed. If taxed, they would be citizens, or a portion of the sovereign people. If *Indians* are *aliens,* whence is derived the legislative authority to annul contracts with them ? By the act of *April* 4, 1801, (sess. 24. ch. 97. 1 *K.* and *R. L.* 464.) the *Brothertown Indians* were authorized to hold town meetings, and elect town officers. The doctrine of estoppel, applies to acts of government. (10 *Mass. Rep.* 155.) Is not our government estopped by their own acts, from denying the rights of citizenship to *Indians,* when claimed by them ?

2. *William,* the son of the *Indian* patentee, was, also, competent to convey to the lessor of the plaintiff; and, as no constitutional or legislative provision existed, at the execution of his deed, to restrain individual *Indians* from selling and conveying their private property, or directing any particular mode of conveyance, different from that used in

ordinary cases, the deed was valid and operative. But, it is said, that an *Indian* has no right to aliene his land, by the 37th article of the constitution. The preamble to the act of the 18th of *March*, 1788, states, most explicitly, its object, which was to prevent violations of the 37th article of the constitution, which applies only to *native* titles, held by *Indian* tribes, as communities or nations. Its object was, to guard against the animosities of the tribes, not of individual *Indians*. At that time, there was not, in fact, any individual *Indian* title. The legislature, in passing the act of 1788, did not mean to go beyond the article of the constitution. The great object of the framers of the constitution, and of the legislature, was, to prevent the purchase of the *native Indian right* to lands in the state. The counsel for the plaintiff have not cited a single instance of an individual *Indian* title, prior to 1788. That act was passed to enforce the provisions of the constitution, not to make a new rule. Titles of acts, as well as preambles, are to be taken into consideration, in construing statutes. (*Plowd.* 205. 231. 369. *Co. Litt.* 79 *a.* 5 *Johns. Rep.* 333, 334. 12 *Johns. Rep.* 175, 176.) Individual *Indians* had, in early times, as chiefs, or heads of tribes, aliened the lands of the tribes, and the act of 1788 was intended to reach cases of that sort. The act of Congress, regulating trade and intercourse with *Indian* tribes, passed *March* 30, 1802, (*Cong.* 7. sess. 1. ch. 273. s. 12. *Laws of U. S.* Vol. 3. p. 463.) which has the words " *Indian*, or nation, or tribe of *Indians*," confirms this construction. The Supreme Court, in the cases of *Jackson* v. *Sharp*, (14 *Johns. Rep.* 472.) and in *Jackson* v. *Brown*, (15 *Johns. Rep.* 265.) decided, after full discussion and examination of the question, that an individual *Indian*, seised of lands, might aliene them. The Surveyor General has since been governed by those decisions; and has not thought it requisite to give his approbation of such deeds. The act of 1790, prohibiting contracts with *Indians*, or suits against them, admits the validity of antecedent contracts with them, and that they might sue and be sued, like other citizens. The act does not proceed on the ground of any civil incapacity to contract; but, in order to preserve peace, it takes from the *Indian* the power of contracting, while he

IN ERROR.
·······
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

resides with his tribe. A conveyance from a *feme covert*, duly acknowledged, is sufficient to pass her estate ; but no action can be maintained against her, upon the covenants contained in the deed.    (15 *Johns. Rep.* 487.    17 *Johns. Rep.* 168.)    The situation of an *Indian* owner of land, under the act of 1790, is similar.    The deed, or covenant, is in full force, but the remedy is suspended ; and whenever the *Indian* abandons his tribe, he may be sued.    But if legislative consent were necessary to the validity of the conveyance, we contend that such consent has been given.    By "the act concerning tenures," passed *February* 20, 1787, (sess. 10. ch. 36. s. 1.) it is enacted, "That it shall for ever hereafter be lawful for every freeholder to give, sell, or aliene the lands or tenements whereof he or she is, or at any time shall be, seised in fee simple," &c.    The act is general and unqualified ; it contains no exception as to *Indians*. The tenure of all lands, granted by the state, is purely *allodial*, not feudal.    Estates, thus granted, cannot be abridged by any subsequent acts of the legislature ; surely not by construction.    The patent, in this case, was issued to the grantee, for his services, as a soldier, in the line of this state, during the revolutionary war.    The grant is to him, his heirs and assigns.    The act of *April* 6, 1790, (sess. 13. ch. 59.    2 *Greenl.* ed. *Laws*, 332.) " *to carry into effect the concurrent resolutions and acts of the legislature,* for granting certain lands, promised to be given as bounty lands," was a legislative grant to every patentee, of the unrestrained power of alienation.    Whenever it was intended, that the *Indian* grantee should not aliene, the restriction was incorporated in the grant itself.    (*Act of 8th of April,* 1802, sess. 25. ch. 112. s. 10.  *Grant to Lewis Denny, and other Oneida Indians.*)    The grantees themselves, but not their heirs, are prohibited from aliening the lands granted to them. The plain inference from this statute is, that those *Indians* have a right to sell, if not expressly prohibited by statute. In 1788, the *Oneida* and other tribes of *Indians*, ceded all their lands to this state ; certain portions of which were, however, reserved to the *Indians*, with the restriction not to sell, though they might lease them.    (*Laws of U. S.* Vol. 1. p. 315. 322.)    Many patents were granted to aliens for mi-

litary services, and their power to aliene their lands was ne-
ver questioned.

*Van Vechten*, in reply, said, that it was conceded by the
Supreme Court, and by the counsel for the defendant in er-
ror, that the *Indian* tribes were not, formerly, or, at all
times, subjects or citizens. It is incumbent on them, then,
to show the *time* when, and the *act* by which, they surren-
dered their independence, and became citizens. Conquest,
or voluntary submission, are the only modes by which a so-
vereign nation can surrender its independence, and become
incorporated with another nation or sovereignty. (*Vattel*,
B. 1. ch. 16. s. 192, 193, 194.) The *Chief Justice* says,
the condition of these tribes " has been gradually chang-
ing, until they have lost every attribute of sovereignty, and
become entirely dependent upon, and subject to our govern-
ment." But this is contrary to the doctrine of *Vattel.*
That writer observes, that " natives are those born in the
country of parents who are citizens." " That in order to
be of the country, it is necessary that a person be born of a
father who is a citizen ; for, if he is born there of a stran-
ger, it will be only the place of his birth, not of his coun-
try." " Inhabitants, as distinguished from citizens, are
strangers who are permitted to settle and stay in the coun-
try." " They enjoy only the advantages which the laws
or custom gives them." " The *perpetual inhabitants* are
those who have received the right of perpetual residence.
These are a kind of citizens of an inferior order, and are
united, and subject to the society, without participating in
all its advantages. The children follow the condition of
their fathers." (B. 1. ch. 19. s. 212, 213.) The persons
here described are not citizens ; their situation is as much
*sui generis*, as that of the *Indian* tribes in this state. The
*Indian* lessor, in this case, was born in the bosom of his
tribe, and within the domain reserved to them, or ceded to
them as a nation, by our government. Though known to
reside within our jurisdiction, they have always been treated
by the *United States* as nations. The authority we exer-
cise over them, as to punishing for crimes, &c., is no more
than what is exercised over other aliens residing among us,

IN ERROR.
........

ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

and who are subject to our laws. The late act of the legislature, (sess. 45. ch. 204.) relative to the *Indian* called *Tommy Jemmy*, asserting the jurisdiction of the state, was unnecessary, if he was a citizen. The criminal jurisdiction of the state over all persons residing within its territory, was undoubted; and such a jurisdiction is perfectly consistent with those unequal alliances formed by these tribes who have placed themselves under our protection. (*Grotius*, B. 1. ch. 3. s. 21, 22, 23. *Vattel*, B. 1. ch. 1.) The state has done many humane and benevolent acts towards these *Indians*, to protect them from the consequences of their ignorance and incapacity. Nothing is to be inferred from their being occasionally called subjects, in the records of the colonial government, as the numerous public acts and treaties with them repel every idea of their being subjects or citizens. The *Oneida Indians* did not, as a *tribe*, join our army in the revolutionary war, but only a portion of their warriors. A patent, or grant of land from the state, does not make the grantee a citizen, or confer the rights of citizenship. Congress alone can make citizens. The act relative to *tenures*, does not touch the question of citizenship.

It is said, that the state is estopped by its own acts from denying to these *Indians* the rights and privileges of citizenship. But estoppels are mutual; and the *Indians*, by continuing to assert their independence, as distinct tribes or nations, as they do on all occasions, are estopped from claiming all the rights of citizens. There is, then, estoppel against estoppel, and the matter remains at large. The heirs of *Hessians*, and other foreigners who served as soldiers in the revolutionary army, cannot take lands by descent; the law of *escheat* is in continual operation against them. The 37th article of the constitution, and the various acts of the legislature which have been passed on the subject, are perfectly nugatory and absurd, on the principle that these *Indians* are citizens; but are proper, intelligible, and consistent, on the idea of their being aliens. Aliens can purchase and sell land, and their title is good as against all the world, except the state. (5 *Co. Litt.* 53. *Plowd.* 230. 1 *Johns. Cases*, 399. 3 *Johns. Cases*, 109. 112, 113. 335.) In the case of *Jackson* v. *Sharp*, (14 *Johns.*

*Rep.* 472.) the question, as to the right of the heir of an *Indian* patentee to convey, did not arise, as the Chief Justice, in *Jackson* v. *Brown*, (15 *Johns. Rep.* 264.) seemed to suppose.

THE CHANCELLOR. Two questions have been made and discussed in this case:

(1) Whether *William*, the only lawful issue of *John Sagoharase*, the *Oneida Indian*, was competent to take, and hold as heir, the lands in question, which had been granted to his father by the patent of the 12th of *July*, 1792 ?

(2) Whether *Peter Smith* acquired a lawful title to those lands by the deed from *William*, the heir, in the year 1797 ?

1. The patent is stated to have issued in pursuance of the act of the legislature of the 6th of *April*, 1790, and it grants the lands, in the usual form, to Lieutenant *John Sagoharase*, " his heirs and assigns, as a good and indefeasible estate of inheritance, for ever." It is stated, in the special verdict, that this *John Sagoharase* was an *Oneida Indian*, and a lieutenant in a company of *Indians* in the army of the *United States*, in the line of this state, in the revolutionary war.

I think it might have admitted of a question, whether the patent to *Sagoharase* was not issued unadvisedly by the commissioners of the land office, and without authority of law. The act under which it issued, directed the commissioners to issue letters patent to persons entitled to lands by virtue of the concurrent resolutions of the senate and assembly, of the 27th of *March*, 1783, and by virtue of the 11th section of the act of the 11th of *May*, 1784. To determine who were entitled, it was necessary to recur to those resolutions, and to that eleventh section. The concurrent resolution of the 27th of *March*, 1783, declared, that " the legislature would provide, that the generals then serving in the line of the army of the *United States*, and being citizens of this state, and the officers and privates of the two regiments of infantry commanded by Colonels *Van Schaick* and *Van Cortlandt*, and the officers of Colonel *Lamb's* regiment of artillery, who were inhabitants of this state, and the privates thereof, and all officers deranged by the act of Con-

gress of 16th of *September*, 1776, and all officers recommended by Congress as persons whose depreciation or pay ought to be made good by this state, and who may hold military commissions in the line of the army at the close of the war," sho'ld receive a bounty of lands according to a ratio there prescribed, and by which a lieutenant was to receive 1000 acres.

Lieutenant *Sagoharase* did not come within the terms of this concurrent resolution. He was not an officer in *Van Schaick's* or *Van Cortlandt's* regiment of infantry, or Colonel *Lamb's* regiment of artillery. That, I apprehend, cannot be pretended. A company of *Indians*, certainly formed no part of either of those three regiments, and were never known or returned as such. Nor was he a deranged officer under the resolution of Congress of the 16th of *September*, 1776, as is evident from the face of that resolution. And there is as little ground to infer, that he was one of the officers recommended by Congress as persons whose depreciation or pay ought to be made good by this state. That provision was also expressly confined to those officers who held military commissions in the line of the army, *at the close of the war*, whereas, *Sagoharase* died before the 27th of *March*, 1783.

He was, therefore, not embraced by the terms of the concurrent resolution of *March*, 1783; and the eleventh section of the act of the 11th of *May*, 1784, was confined to the officers and soldiers of Colonel *Lamb's* regiment of artillery. The patent was issued, according to the terms of it, under the authority of the act of the 6th of *April*, 1790, yet that act confined the bounty to those officers and soldiers which have been specified, and *Sagoharase* did not come within the description. Upon what legal authority was this patent issued ? By the acts of the 11th of *May*, 1784, and of the 6th of *April*, 1790, the commissioners of the land office were to *decide* who were entitled to lands under the concurrent resolution ; and by the latter act, they were to examine the claims of the officers and soldiers who were returned as the quota of this state, and those of them who received the depreciation of their pay from this state, were to be entitled to the gratuity and bounty lands. This last pro-

vision does not help the patent, for a company of *Indians* never could have been returned as part of the quota of this state.

I have not been able, then, to discover the legislative authority for this patent. But the commissioners of the land office did decide, that *Sagoharase* was entitled to a portion of the bounty lands as a lieutenant, and we ought now to acquiesce in the authority of that decision. They gave him a patent, not for 1,000, but for 1,200 acres ; and it is now too late, and certainly this is not the occasion, to call in question the validity of the patent. The legislature, by the act of the 7th of *March,* 1809, made for the relief of the heirs of the *Oneida Indians,* to whom lands had been granted, assume those grants to be valid. The decision of the commissioners of the land office must now be taken to have been correctly made ; and owing to the numerous and complex provisions in the early laws of this state on the subject of military grants, it is very possible there may have been some further, or other authority for these *Indian* patents, which I have not discovered.

The patent was granted in 1792, and the patentee was dead before the 27th of *March,* 1783. But the act of 1790, to which I have already referred, provided that the patents should issue in the names of the persons who had actually served in the line of the army of the *United States,* as designated in the concurrent resolutions, and that the lands should be deemed to have vested in the grantees and their heirs, on the 27th of *March,* 1783. This provision, however, was not sufficient for a case like the present, for here the patentee was dead on the 27th of *March,* 1783 ; and had it not been for the subsequent act of the 5th of *April,* 1803, I should have considered the patent as null and void, because, the act of 1790 could not, by any just construction, be considered as authorizing grants, when the patentee was not alive in *March,* 1783, the period to which the patent was to have relation. But, the act of 1803, removed this objection to patents made to persons who were dead in 1783, by declaring that patents to officers and soldiers serving in the line of this state, in the army of the *United States,* in the revolutionary war, and who died *previous* to the 27th of *March,*

IN ERROR.
. . . . . . .
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

IN ERROR.
.......
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

1783, vested in those persons, at the time of their deaths respectively.

We have now arrived at this conclusion, and which, in the further progress of this decision, I shall assume to be a just and true one, that the patent to *Sagoharase* was duly issued by authority of the legislature, and vested in him, his heirs and assigns, a good and indefeasible estate of inheritance in the premises in question, at the time of his death, which was prior to *March,* 1783. The important question now occurs, what heirs of *John Sagoharase* were intended by the grant? He was an *Oneida Indian,* and lieutenant of a company of *Indians,* and died in the war. The patent was, in effect, a grant to his heirs, though taken in his name, for he had been dead at least ten years when the patent issued. Could the government of this state have meant any other than *Indian* heirs? It was not to be supposed that he had, or could possibly have had any other heirs; and if the grant was not intended for his *Indian* heirs, it was a void and an absurd grant. He was dead, and could not take; and if his son *William,* his only lawful issue, could not take as heir, who could take? Clearly, no person; and can we believe, that a specific grant of land in fee, made by due authority of government, to an individual *Indian* by name, was intended to be illusory, and to mean nothing? The government acted with knowledge and discretion on the occasion; they knew the character of the grantee, and they knew the services he had rendered. The honour and good faith of the state would seem to require, that the grant should have a real and effectual operation, and be deemed to enure to the benefit of *William,* the only lawful issue of the patentee, notwithstanding he belonged to the *Oneida* tribe of *Indians,* as his father had before him. Whether the *Oneida Indians* are to be regarded as aliens or citizens, as a tribe, with some fragments of their ancient independence, or as completely subjugated, broken down, and merged in the great body of our people, appears to me to be quite immaterial in reference to the title of this heir. The government must have intended that the *Indian* heir should take, and the grant is not susceptible of any other reasonable construction. It was no matter, then, in what

civil or political relation the *Indian* heir stood in respect to the whites; he still took *as heir*, because the government was competent to vest him with that capacity, and the intention to do it is implied in the grant itself, which was issued by authority of law. This conclusion appears to me too clear to be a mistaken one; and I would here observe, that a patent issued from the land office, in pursuance of a statute, is equivalent, in force and effect, to a legislative grant, directly to the individual. Now, it is understood to be a general rule, that when an alien is allowed specially by statute, to take and hold lands to him and *his heirs*, (and such statutes have been passed at almost every session since the revolution,) he has of course a capacity to transmit, by inheritance, to his alien offspring, and they have equally a capacity to take. When the legislature speak without restriction or qualification of the heirs of an alien, they must mean such heirs as he was then competent to have; and it would be a reproach to the good sense, or to the good faith of the legislature, to suppose, they could have any other meaning. It was formerly very common to provide in these special statutes, allowing aliens by name to hold lands in fee, that the alien purchaser should not sell or assign, except to a citizen; but there never was an instance of a proviso that his heirs should not take the inheritance after him, except they were citizens. There is a wide and a most material difference between the right to sell to an alien stranger, and the right to transmit by descent to the alien heir. The former is a free and voluntary act resting on contract, and can readily be dispensed with, without inconvenience; but the latter right is a part of the law of our nature, and deeply rooted in the social affections. Even those prohibitions against selling to aliens were unnecessary, and have latterly been omitted as useless, for without such a proviso the alien purchaser could not convey his land to another alien, so as to vest him with a sure and indefeasible estate; for our own native citizens have not that power.

The permission, then, by law, to an alien, to take and hold lands to him and his heirs, or a grant from government by authority of law, to an alien and his heirs, does necessarily imply, that he may transmit by descent to his children, or

IN ERROR.

ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

IN ERROR.
.......
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

other alien heirs, and that his heirs may take the land in question equally as if they were natural born citizens. No alien, in his right mind, would purchase upon any other construction; many of them must have no expectation of having any other than alien heirs. It would be painful for them to await the arrival of the period of naturalization, and the uncertainty of acquiring a new race of natural born or naturalized descendants. They may be too advanced in life to expect it, or they may be suddenly cut off in the midst of their expectations. And permit me to ask, where would be the benevolence, or the magnanimity, or the justice, or the good faith of government, if it should so far deal with an alien as to permit him to purchase lands to himself, and his heirs, or to make, (as in the present case,) a gratuitous grant of lands to him and his heirs, to-day, and, then, on the morrow, to snatch it from his orphan son, under the pretence that he was an alien. Such a privilege would be, in truth, no privilege. It would be a heartless and a fraudulent grant, with the deadly power of *escheat* concealed in its enclosure.

But the act of the 7th of *March*, 1809, removed all scruples on this point, by declaring, that the heirs of each of the *Indians* to whom land had been granted by this state, for military services in the war between the *United States* and *Great Britain*, should be, and were made capable of taking and holding any such lands by descent, in the same manner as if such heirs were citizens of this state at the death of their ancestor. This provision, as I construe it, was nothing more than declaratory of what was already the rule on that subject, because, it seems impossible to maintain, upon any sound principles of construction, that the heirs of the *Indian* patentee, being *Indians*, would not have taken by descent without this act. The treaty between the *United States* and *Great Britain*, in 1794, contained a similar declaratory provision, that *British* subjects, and *American* citizens, who then held lands in the dominions of either power, might sell and devise them as if they were natives; and that neither they, nor *their heirs* or assigns, should, so far as respected those lands, be regarded as aliens. This treaty was only a publication of the existing law of each

country, as far as the heirs of persons then lawfully seised were concerned; but it went further than the law would have gone without the article, for it allowed the owners of the land not only to transmit by descent to their alien heirs, but even to sell or devise to aliens.

In the view which I have thus taken of the case, the question discussed in the Supreme Court, and which has occupied a large share of the attention of the counsel in the argument before this Court, does not appear to be of any consequence in the decision of the cause. " The question," says the Chief Justice, in the opinion which he delivered, " is simply, whether a legitimate child of an *Indian*, holding property by grant from the state, to him individually, is to be regarded as his heir, so far as to take by inheritance; and this," he says, " involves the inquiry, whether an *Oneida Indian* is to be considered a citizen of the state, or an alien." He then enters into a train of argument, to show, that the *Indians* within this state are, in contemplation of law, citizens, and not aliens; and upon that fact he concludes, that *William Sagoharase* took the lot in question by descent, as heir to his father *John*. Now, with great respect for the opinion of the Supreme Court, I beg leave to observe, that the question whether *William* was competent to take the lot as heir, does not depend upon the character of *William* as an alien or citizen, *for be he which he may*, the grant from the government to *John*, and his heirs, of necessity, and upon the established principles and usages of law, included the *Indian* son, who was his only lawful issue.

But as the Court below, and the counsel upon the argument here, have thought it material to discuss the question, whether *William*, the *Indian* heir, was to be regarded as an alien or a citizen, on the death of his father, I ought, very properly, to distrust the correctness of my own views upon that subject, and pay some attention to their learned investigations.

The *Oneidas*, and the other tribes composing the six nations of *Indians*, were, originally, free and independent nations. It is for the counsel, who contend that they have now ceased to be a distinct people, and become completely incorporated with us, and clothed with all the rights, and

IN ERROR.
•••••••
ALBANY,
Feb. 1823.

GOODELL
. v.
JACKSON.

bound to all the duties of citizens, to point out the precise time when that event took place. I have not been able to designate the period, or to discover the requisite evidence of such an entire and total revolution. Do our laws, even at this day, allow these *Indians* to participate equally with us, in our civil and political privileges? Do they vote at our elections, or are they represented in our legislature, or have they any concern, as jurors or magistrates, in the administration of justice? Are they, on the other hand, charged with the duties and burthens of citizens? Do they pay taxes, or serve in the militia, or are they required to take a share in any of the details of our local institutions? Do we interfere with the disposition, or descent, or tenure of their property, as between themselves? Do we prove their wills, or grant letters of administration upon their intestate's estates? Do our *Sunday* laws, our school laws, our poor laws, our laws concerning infants and apprentices, or concerning idiots, lunatics, or habitual drunkards, apply to them? Are they subject to our laws, or the laws of the *United States*, against high treason; and do we treat and punish them as traitors, instead of public enemies, when they make war upon us? Are they subject to our laws of marriage and divorce, and would we sustain a criminal prosecution for bigamy, if they should change their wives or husbands, at their own pleasure, and according to their own customs, and contract new matrimonial alliances? I apprehend, that every one of these questions must be answered in the negative, and that on all these points they are regarded as dependent allies, and alien communities. It was, therefore, with some degree of surprise, that I observed the Supreme Court laying down the doctrine in this case, that these *Indians* of the six nations were " as completely the subjects of our laws as any of our own citizens." In my view of the subject, they have never been regarded as citizens or members of our body politic, within the contemplation of the constitution. They have always been, and are still considered by our laws as dependent tribes, governed by their own usages and chiefs, but placed under our protection, and subject to our coercion, so far as the public safety required it, and no farther.

The five nations once formed the fiercest and most for-
midable confederacy of *Indian* republics ever known in
*North America;* and, by their prowess and enterprise, they
held distant tribes of *Indians* under dominion and tribute.
But, after the settlement of the colony, and their communi-
cation with the whites, they began to degenerate, and to
descend by gradual, but perceptible degrees, from their ori-
ginal elevation. Ever since the war of 1756, their fall has
been more precipitate, and with a more sensible diminution
of their population, power, and territory, as well as of
their pride and glory. The whites have been pressing
upon them as they kept receding from the approaches of
civilization. We have, at length, intruded our influence
into their domestic concerns. We have purchased the
greater part of their lands, destroyed their hunting grounds,
subdued the wilderness around them, overwhelmed them
with our population, and gradually abridged their native inde-
pendence. Still, however, they are permitted to exist as
distinct nations, and we continue to treat with their sachems
in a national capacity, and as being the lawful representa-
tives of their tribes. Through the whole series of our co-
lonial history, these *Indians* were considered as dependent
allies, who advance for themselves the proud claim of free
nations, but who had voluntarily, and upon honourable
terms, placed themselves and their lands under the protec-
tion of the *British* government. The colonial authorities
uniformly negotiated with them, and made and observed
treaties with them, as sovereign communities, exercising the
right of free deliberation and action; but, in consideration
of protection, owing a qualified subjection, in a national,
but not in any individual capacity, to the *British* crown.

No argument can be drawn against the sovereignty of
these *Indian* nations, from the fact of their having put them-
selves and their lands under *British* protection. Such a
fact is of frequent occurrence in the transactions between
independent nations.

One community may be bound to another by a very une-
qual alliance, and still be a sovereign state. Though a
weak state, in order to provide for its safety, should place
itself under the protection of a more powerful one, yet, ac-

IN ERROR.
.......
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

cording to *Vattel*, (B. 1. ch. 1. s. 5 and 6.) if it reserves to itself the right of governing its own body, it ought to be considered as an independent state.   There are several kinds of submission, says this same Jurist.   (B. 1. ch. 16. s. 194.)   The submission may leave the inferior nation a part of the sovereignty, restraining it only in certain respects, or it may totally abolish it, or the lesser may be incorporated with the greater power, so as to form one single state, in which all the citizens will have equal privileges. Now, it is very apparent, from our whole history, that the submission of the six nations has been of the former kind, and that, as an inferior nation, they were only restrained of their sovereignty in certain respects.   Though born within our territorial limits, the *Indians* are considered as born under the dominion of their tribes.   They are not our subjects, born within the purview of the law, because they are not born in obedience to us.   They belong, by birth, to their own tribes, and these tribes are placed under our protection, and dependent upon us ; but still we recognise them as national communities.   In this situation we stood in relation to each other, at the commencement of our revolution.

The *American* Congress held a treaty with the six nations, in *August*, 1775, in the name, and on behalf of the United Colonies, and a convention of neutrality was made between them.   " This is a family quarrel between us and old *England*," said the agents, in the name of the colonies ; " you *Indians* are not concerned in it.   We desire you to remain at home, and not join either side."   Again, in 1776, Congress tendered protection and friendship to the *Indians*, and resolved, that no *Indians* should be employed as soldiers in the armies of the *United States*, before the tribe, to which they belonged, should, in a national council, have consented thereunto, nor then, without the express approbation of Congress.   What acts of government could more clearly and strongly designate these *Indians* as totally detached from our bodies politic, and as separate and independent communities ?

In 1778, Congress resolved, that they would chastise the *Senecas*, who had joined the enemy, and would reduce them to terms of peace ; and when some *Seneca* chiefs appeared

at *Philadelphia,* they directed the board of war to inquire, whether they came in the character of representatives or ambassadors of their nation? And when, in 1779, Congress had resolved upon terms of peace with the *Indians,* the conditions were such as would be dictated to a public enemy, known as such by the laws of war; they had not the remotest resemblance to the terms or spirit of a negotiation with citizens or subjects who had broken their allegiance. In 1783, Congress expressly waived the right of conquest over the *Indians,* and recommended proffers of peace and a friendly treaty, for the purpose of receiving them into favour and protection. Lastly, in *October,* 1784, a treaty of peace was made at *Fort Stanwix,* between the *United States* and the sachems and warriors of the six nations; and the *United States* gave peace to those of the six nations who had been hostile, and received them under protection, and required, that the hostile tribes should stipulate, that the *Oneidas,* and *Tuscaroras,* should be secured in the possession of their lands.

There was nothing, then, in any act or proceeding, on the part of the *United States,* during the revolutionary war, which went to impair, and much less to extinguish the national character of the six nations, and consolidate them with our own people. Every public document speaks a different language, and admits their distinct existence and competence as nations, but placed in the same state of dependence, and calling for the same protection which existed before the war.

The report of a committee of Congress, in *May,* 1782, placed the condition of these six nations upon the true foundation, in point of fact. It appeared, they said, that all the lands of the six nations had been by them, as appendant to the government of *New-York,* in due form, placed under the protection of the crown of *England,* so far as respected jurisdiction only; and that the colony of *New-York,* for upwards of one hundred years, had protected these nations as the dependents and allies of that government.

In 1794, there was another treaty made between the *United States* and the six nations, in which perpetual peace and friendship were declared between the contracting par-

IN ERROR.
.......
ALBANY,
Feb. 1823.
GOODELL
v.
JACKSON.

ties, and the *United States* acknowledged the lands reserved to the *Oneida, Onondaga,* and *Cayuga* nations, in and by their treaties with this state, to be their property ; and the treaty contains this provision, which has a very important and a very decisive bearing upon the point under discussion : The *United States* and the six nations agree, that for injuries done by individuals, on either side, no private retaliation shall take place, but complaint shall be made by the injured party to the other ; that is, by the six nations, or any of them, to the President of the *United States,* and by or on behalf of the President, to the principal Chiefs of the six nations, or of the nation to which the offender belongs. What more demonstrable proof can we require, of existing and acknowledged sovereignty residing in those *Indians.* We have here the forms and requisitions peculiar to the intercourse between friendly and independent states, and they are conformable to the received institutes of the law of nations. The *United States* have never dealt with those people, within our national limits, as if they were extinguished sovereignties. They have constantly treated with them as dependent nations, governed by their own usages, and possessing governments competent to make and to maintain treaties. They have considered them as public enemies in war, and allied friends in peace. If mere territorial jurisdiction would make the six nations citizens of this state, the same effect must have been produced as to the numerous tribes of *Indians* included within the vast territorial limits of the *United States;* and it is worth a moment's attention to observe the relations existing between the *United States* and the *Indians,* to the south and to the west.

In the treaty between the *United States* and the *Wiandots, Ottawas, Chippewas,* and others, in 1785, it was provided, that if any *Indian* commit murder, or robbery, upon a citizen of the *United States,* they shall deliver him up to be punished according to our law. This surrender of criminals is here made part of a national compact, and the distinction is preserved between *Indians* and citizens ; and, while we assume the right to redress the injuries of the one, we abandon the other to the protection of their own people. The treaties with the *Cherokees,* in 1785, and 1791, go

IN ERROR.
•••••••
ALBANY,
Feb. 1823.

GOODELL.
v.
JACKSON.

further, and provide, that citizens of the *United States* committing robbery, or murder, on the *Cherokees*, shall be punished by us in like manner as if the same were committed upon one of our own citizens. They also contain a new and striking provision, and that is, that citizens settling upon their lands, thereby *forfeit the protection of the United States*, and the *Cherokees* may punish them as they please. The same provision, relative to the surrender and punishment of persons guilty of murder, or robbery, is inserted in the treaties with the *Choctaws, Chickasaws, Shawanese, Creeks, Ottawas, Chippewas,* &c. And, in the treaties with the latter tribes, in 1789, and 1795, citizens settling on their lands are declared to be out of the protection of the *United States,* and liable to punishment at the discretion of the *Indians.*

It would seem to me to be almost idle to contend, in the face of such provisions, that these *Indians* were citizens or subjects of the *United States,* and not alien and sovereign tribes.

In the ordinance of Congress, in 1787, passed for the government of the territory of the *United States* northwest of the *Ohio,* it was declared, that the *Indians* within that territory should never be invaded or disturbed in their property, rights, or liberties, unless *in just and lawful war.* By a just and lawful war, is here meant, a controversy according to the public law of nations, between independent states, and not an insurrection and rebellion. The *United States* have never undertaken to negotiate with the *Indian* tribes, except in their national character. They have always asserted their claims against them in the only two ways known to nations, upon the ground of stipulation by treaty, or by force of arms. The ordinance further provided, that laws should be made to prevent wrongs done to the *Indians;* and this implies a state of dependence and imbecility on the part of the *Indians,* and that correspondent claim upon us for protection, arising out of the superiority of our condition, which afford the true solution to most of our regulations concerning them.

We are now prepared again to put the question, where is the evidence of the fact, or where is the ground for

the assertion, that at the death of *John Sagoharase*, as early as *March*, 1783, the *Oneida* tribe of *Indians* had ceased to be a nation, and had become an integral part of the people of this state, in whose name and by whose authority the constitution was ordained ? No proposition would seem to me to be more utterly fallacious, and more entirely destitute of any real foundation in historical truth. It is repugnant to all the treaties, and to all the public documents, to the declared sense and practice of the colonial governments, and of the government of the *United States*, and of this state. The question is not, what changes the six nations, or the *Oneidas*, in particular, have undergone since 1783; but the question is, were the *Indians* belonging to the tribe of *Oneidas*, and residing with the *Oneidas*, in 1783, when *John Sagoharase* died, citizens of this state, and capable of purchasing, holding, and inheriting freehold estates, in the character of citizens, with all the appendant rights. In my opinion, if the grant to *John*, the father, did not, of itself, authorize *William*, the son, to inherit as heir, he had no capacity to take, for he was an alien, placed under our protection, as one of the members of his tribe, but not owing us personal obedience and allegiance as a subject. If the patent did not exclusively render him competent to inherit as heir, then he had no such ability until the act of 1809, which declared that the heirs of *Oneida* patentees should be competent to take, " in the same manner as if such heirs were citizens of this state at the death of their ancestors;" and this act was not passed until two years subsequent to the deed to *Peter Smith*.

But though it be immaterial, as to the point under discussion, what became of the *Oneida* nation since the death of *John*, the patentee, yet, in the opinion of the Supreme Court, much stress appears to have been laid upon the act of the 12th of *April*, 1822, pardoning *Tommy Jemmy*, and asserting exclusive criminal jurisdiction in the Courts of this, and the *United States*, over all crimes and offences committed within the state. Admitting that this act completely annihilated the national character, and the sovereign attributes of the six nations, what has this fact to do with the inquiry, how those nations stood, forty years ago,

when *John Sagoharase* died, and when his son is asserted to have succeeded as heir? Though this act may have gone a step beyond any former proceeding, in respect to *Indian* sovereignty, yet it only restrained the exercise of it in one particular mode, and claimed that jurisdiction over our own territory, which is perfectly consistent with the admission of the alienage, and distinct national character of the *Indians.* It is understood that witchcraft is the only offence which the *Indians* have undertaken to punish judicially, as a community. It was a sentence for that offence that led to the act for which *Tommy Jemmy* was tried. All other offences are said to be left to the arm of private and family revenge; and their irregular and foul executions were shocking to humanity, and were not to be tolerated in the neighbourhood, and under the eye of a civilized and Christian people. Under the circumstances in which we were placed in relation to those *Indians,* as their guardians and protectors, we had a right to avail ourselves of the superiority of our character, and put a stop to such irregular and horrible punishments, even as our nation claims the right of punishing the subjects of other independent powers, without the consent, and against the will of their own governments, if they are caught in carrying on the *African* slave trade.

I do not, therefore, consider the act of 1822, as affecting the question, whether the remainder of the six nations still rightfully exist as a separate people, or whether they have become amalgamated with us, and incorporated into the body politic, as members and citizens. In my opinion, that statute had no such intention ; and when the time shall arrive for us to break down the partition wall between us and them, and to annihilate the political existence of the *Indians* as nations and tribes, I trust we shall act fairly and explicitly, and endeavour to effect it with the full knowledge and assent of the *Indians* themselves, and with the most scrupulous regard to their weaknesses and prejudices, and with the entire approbation of the government of the *United States.* I am satisfied, that such a course would be required by prudence, and would become necessary, not only for conscience sake, but for the reputation of our justice.

So late as the 5th of *April*, 1813, the legislature authorized the governor to hold a treaty, on the part of the people of this state, with the *Oneida* nation of *Indians*, and with any other *Indian* nations or tribes within this state. And here let us observe who were to be the contracting parties to this treaty, by the very words of the statute. They are *the People of this State* on the one part, and the *Oneida nation* on the other. What language can be more unequivocal to show, that the *Oneida* nation was then subsisting as a distinct community, recognised in a national character, and as competent to treat in that character, and that they did not form an integral part of the people of this state. Indeed, so clear does this point appear to my judgment, that if it were not for the great authority of the opinion which we are reviewing, and for the able argument which we have heard, I should suppose that I had been combating a shadow.

If, therefore, the case turned upon the question, whether *William*, the *Indian* heir, was a citizen or an alien in 1783, I should not be in favour of the conclusion drawn by the Supreme Court. But I do not place the cause upon that ground, for the reasons which have already been mentioned. I take it, as a given point, that the patent issued according to the direction, and under the authority of the statute mentioned in it, because such had been the decision of the commissioners of the land office, and because the legislature, afterwards, held such patents to be valid; and then, I say, that the grant to *John Sagoharase*, and his heirs, rendered the *Indian* heir competent to take, though an alien, and his title was not liable to be impeached on account of his civil or political condition.

If *William* took the estate as heir, then the next, and only remaining head of inquiry, is, whether *Peter Smith* was authorized to purchase from *William*, the heir, in the year 1797. The Supreme Court were of opinion, that the purchase by *Smith* was lawful and valid, and that, in 1797, there was no prohibition to purchasers of land from individual *Indians*, but only from *Indians* as a tribe or community. The Court, on this point, entered into no discussion, but merely referred to one or more former decisions, as settling the question. Before entering at large into the subject, it may

be useful to state briefly the substance of the various and conflicting decisions of the Supreme Court.

IN ERROR.
••••••
ALBANY,
Feb. 1823.
GOODELL
v.
JACKSON.

The same questions which we have now before us, arose in the case of *Jackson* v. *Wood,* which was decided in the Supreme Court, in 1810, (7 *Johns. Rep.* 290.) That was the case of a patent for a military lot, granted in 1791, to an *Oneida Indian,* for his services during the revolutionary war. After the death of the patentee, his two sons, who were *Oneida Indians,* residing with the *Oneida* tribe, sold, in 1808, the lot to the plaintiff, and it was contended, in support of the title of the purchaser, and by one of the counsel who argued this cause, on the part of the defendant in error, that the constitution did not apply to sales by individual *Indians,* and that the act of 1788, was not intended to be broader than the constitution. It was contended, on the other side, that the *Indian* heirs were aliens, and so could not inherit; and, also, that the purchase from an individual *Indian* was within the letter and spirit of the 'act of 1788. I had the honour, at that time, to be Chief Justice, and delivered, what was admitted to be, the unanimous opinion of the Court; the other members of the Court were, Judges *Thompson, Spencer, Van Ness,* and *Yates.* It was observed, in the opinion delivered, to be a fact, too notorious to admit of discussion, or to require proof, that the *Oneida Indians* still resided within the state, as a distinct and independent tribe, and that they could not be considered as subjects, born under allegiance, and bound, in the common law sense of the term, to all its duties. That the prohibition in the constitution might, perhaps, refer to purchases from the *Indians* as a tribe, but the act of 1788 carried the prohibition to purchases from individual *Indians,* and the act of 1801 prohibited any action upon any contract against any *Indian* residing upon their lands. These statute regulations, it was observed, showed the sense of the legislature, that an *Indian,* in his individual capacity, was, in a great degree, *inops consilii,* and unfit to make contracts, unless with the consent and under the protection of a civil magistrate. It was concluded, that the purchase from the heirs was within the letter and spirit of the acts of 1788 and 1801, and that those statutes ought to be liberally construed

in favour of the inability ; and judgment was rendered against the purchaser.

If that case was well decided, then the judgment of the Supreme Court, in the case before us, is erroneous, for the two decisions are directly repugnant to each other.

Afterwards, in *Chandler* v. *Edson*, in 1812, (9 *Johns. Rep.* 362.) being the case of an entry upon lands of the *Stockbridge Indians*, the Court unanimously observed, (and I was still a member, and wrote the opinion,) that it was the wise policy of the statute of 1801, (being the revised act which included the act of 1788,) to interdict all individual whites from any contract with the *Indians*, in respect to their lands, or any interest therein. Such a complete and total interdict was indispensable to save the *Indians* from falling victims to their own weakness, and to the superior intelligence, and, sometimes, to the cupidity, of the whites.

This decision, and the principle announced in it, was perfectly in accordance with the preceding decision, and showed the strong conviction of the Court, as to the extent and policy of the prohibition.

The next case was that of *Dana* v. *Dana*, in *May*, 1817, (14 *Johns. Rep.* 181.) in which a suit was brought upon an arbitration bond, against an *Oneida Indian ;* I refer to it, not as an analogous case, but as containing an explicit recognition of the former decisions. The object and policy of the statutory inhibition, said Mr. Justice *Spencer*, in delivering the opinion of the Court, had been already expounded by the two preceding decisions to which he referred. We considered the statute as a guard against the imposition and frauds to which that unfortunate race of men are exposed, from their ignorance and mental debasement.

Thus far, the doctrine of the Court had been uniform, and the public had a right to consider the construction of the statutes, so far as that construction depended upon the Supreme Court, as settled. But in the case of *Jackson* v. *Sharp*, decided in *October*, 1817, (14 *Johns. Rep.* 472.) a different rule of construction was adopted. The patent, in that case, was granted to an *Oneida Indian*, for a military lot, and in 1791, he sold the lot to a white man, and the question was, whether the conveyance was valid. It was

contended, in favour of the purchase, and by the same counsel who had argued in support of that side, in the first case which has been mentioned, that neither the constitution, nor the act of 1788, related to purchases from an individual *Indian*. It was there said, also, that the Court, in *Jackson* v. *Wood*, admitted, that the constitution related to purchases of *Indians* as a tribe. Now, this was not exactly so. The opinion delivered in 1810, was cautious and reserved on that point, and only mentioned, that, *perhaps*, the constitution had such a reference. The opinion of 1810, considered the act of 1788, as extending the prohibition explicitly to all purchases from individual *Indians* as well as from a tribe. The judgment of the Court, in the case of *Jackson* v. *Sharp*, was pronounced by Mr. J. *Yates*; and in the opinion which he delivered in behalf of his brethren, it is said the constitution did not affect the deed, and applied only to purchases from the *Indians* as a community, and that the act of 1788 did not carry the prohibition further than the constitution had carried it, and so the Court held the purchase valid.

The Court undertook to distinguish the case from that of *Jackson* v. *Wood*, for they say the decision in 7 *Johns. Rep.* was decided upon the act of 1801, which was more extensive than the act of 1788. This, I apprehend to be a mistake. The case of *Jackson* v. *Wood*, was decided upon the act of 1788, which was explicitly referred to as reaching the case ; and the provision in the act of 1801, prohibiting suits against *Indians* upon contracts, was referred to principally because it afforded auxiliary considerations. It is impossible that I, for one, could ever have considered that the act of 1788, by being incorporated with many other provisions into the body of the act of 1801, was to receive a different and broader construction, because the preamble was laid aside in the revision of it. The preambles to most of the statutes, were omitted in the revision of 1801, as unnecessarily incumbering the work, and because they could not very well be inserted when the provisions, in various statutes relating to one subject, were all blended together in one consolidated statute. Besides, it had already been settled, by the unanimous opinion of the

IN ERROR.

.......

ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

Court of Errors, in 1805, (*Taylor* v. *Delancey*, 2 *Caines'* *Cases in Error*, 151.) that even the change of phraseology in the language of a revised act, should not be deemed or construed to be a change of the law as it stood before the revision, unless such phraseology evidently purported an intention in the legislature to work a change. And, surely, after such an authority, the Court never could have intended, in 1810, that the act of 1788 was to be more extensively construed, as revised in 1801, merely from the unimportant circumstance, that it had lost the preamble, which is no part of a statute.

The decision of 1817, in undertaking to place the case of *Jackson* v. *Sharp* out of the reach of the decision in *Jackson* v. *Wood*, proceeded evidently upon a mistake. The two decisions are utterly inconsistent with each other, and the latter did overrule the former, and introduce a new rule of construction. This the Court had a right to do, and they were bound to do it, if they had become entirely satisfied, that they had previously mistaken the law. Whether they had mistaken it or not, remains now to be definitively settled by this Court. All that I insist upon, at present, is, that when a rule of property has been once deliberately adopted and declared, it ought not to be disturbed by the same Court, *except for very cogent reasons*, otherwise, the community would never be able to deal with safety, and would be in a state of perplexing uncertainty as to the law.

The 37th article of the constitution of 1777, declared it to be " of great importance to the safety of this state, that peace and amity with the *Indians* within the same, be at all times supported and maintained ; and that the frauds too often practised towards the *Indians,* in contracts made for their lands, had, in divers instances, been productive of dangerous discontents and animosities." It, therefore, ordained, " that no purchases or contracts for the sale of lands, made with, or of the said *Indians,* shall be binding on them, or deemed valid, unless made under the authority, and with the consent of the legislature." This is the provision; and the constitution states one important fact as the basis, and the sole governing motive for the whole of it, and that is, that *frauds* were too often practised towards the *Indians* in

IN ERROR.
••••••••
ALBANY,
Feb. 1823.
GOODELL,
v.
JACKSON.

contracts made for their lands. It was this, and this only, that endangered our peace and amity with them. There was no suggestion of frauds or imposition committed by them upon the whites. That, indeed, would have been an idle suggestion, and about as reasonable as the complaint of the wolf in the fable, that the lamb, standing far below him, was disturbing him in the enjoyment of the running stream. The constitution assumes, as a fact, one great truth, verified by the whole history of our country, that the *Indians*, in their commercial dealings with the whites, were, comparatively, a feeble and a degraded race, who stood in need of the arm of government constantly thrown around them. Before the constitution of this state had been adopted, the Congress of the *United States* had felt and acknowledged *the duty* of protecting the *Indians* from the frauds to which they were exposed, and of which they were too frequently the victims.

Thus, in the resolution of Congress of *January*, 1776, regulating trade with the *Indians*, it was declared, that no person should be permitted to trade with them without license, and that the traders should take no unjust advantage of *their distress and intemperance*. In a speech, on behalf of Congress, to the six nations, in *April*, 1776, it was said to them, that Congress were determined to cultivate peace and friendship with them, and prevent the white people from *wronging them in any manner, or taking their lands*. That Congress wished to afford protection to all their brothers the *Indians*, who lived with them on this great island, and that the white people should not be suffered, *by force or fraud, to deprive them of any of their lands*. And in *November*, 1779, when Congress were discussing the conditions of peace to be allowed to the six nations, they resolved, that one condition should be, that no land should be sold or ceded *by any of the said Indians*, either *as individuals*, or as a nation, unless by consent of Congress.

This resolution, almost coeval with our constitution, shows the important fact, that *individual Indians*, as well as tribes and communities, were, and ought to be, equally protected from imposition in the sale of their lands; and if such were the views of Congress in 1779, why should not

IN ERROR.
........
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

the same views have been in the contemplation of our con-stitution in 1777 ?

The government of the *United States* had, in the earliest and purest days of the republic, watched with great anxiety over the property of the *Indians* intrusted to their care. It must have been immaterial from what source the property proceeded, and whether it was owned by tribes, or families, or individuals. *If it was Indian property in land,* it had a right to protection from us as against our own people. The *Indians* under the colony administrations, confided their lands to our protection. As early as 1684, the *Onondagas* and *Cayugas,* for instance, told the Governor of *New-York,* that they were a free people, and had put their lands and themselves under the protection of the *Duke of York,* and of the great Sachem *Charles,* that lived on the other side of the great water. The friendship of the six nations towards the colony government, and the protection of the government to them, continued unshaken for upwards of a century, and this mutual good faith has received the most honourable, and the most undoubted attestations. Governor *Colden,* in his history of the six nations, states, that the *Dutch* entered into an alliance with them, which continued without any breach on either side, until the *English* conquered the colony in 1664. Friendship and protection were then renewed, and the *Indians,* he says, observed the alliance on their part strictly to his day; and we know that their fidelity continued unshaken down to the period of our revolution. On one occasion, the colonial assembly, in their address to the governor, expressed their abhorrence of the project of reducing the *Indians* by force, and possessing themselves of their lands, for, to the steadiness of these *Indians* to the interest of *Great Britain,* they said, they owed, in a great measure, their internal security. The colony governors constantly acknowledged their friendship and services. We have, on the other hand, in favour of the colony, the report of a committee of Congress, to which I have already alluded, " that the colony of *New-York* had borne the burden, both as to blood and treasure, of protecting and supporting the six nations for more than one hundred years, as the dependents and allies of the government."

After all this, who will not hesitate to say, that it was worthy of the character of our people, enjoying so great a superiority over the *Indians*, in the cultivation of the mind, in the lights of science, the distinctions of property, and the arts of civilized life, to have made the protection of the property of the feeble and dependent remnants of the nations, within our limits, a fundamental article of the government. It is not less wise than it is just, to give to that article a benign and liberal interpretation, in favour of the beneficial end in view. We ought to bear in mind, when we proceed to the consideration of the subject, that the article was introduced for the benefit and protection of the *Indians*, as well as for our own good, and that we are bound to the performance of it, not only by duty, but by gratitude. The six nations were a great and powerful confederacy, and our ancestors, a feeble colony, settled near the coasts of the ocean, and along the shores of the *Hudson* and the *Mohawk*, when these *Indians* first placed themselves, and their lands, under our protection, and formed a covenant chain of friendship that was to endure for ages. And when we consider the long and distressing wars in which the *Indians* were involved on our account with the *Canadian French*, and the artful means which were used, from time to time, to detach them from our alliance, it must be granted that fidelity has been no where better observed, or maintained with a more intrepid spirit, than by these generous barbarians.

The purchase by *Peter Smith*, in 1797, came within the provision of the constitution. It was a purchase of lands of an *Oneida Indian*, residing with his tribe, and within the limits of this state. It was within the mischief and within the spirit, though not strictly within the very letter of the constitution, because the purchase was not made *of the said Indians*, but only *of one* of the said *Indians*. This is all the variation between the fact and the letter, which has given rise to a construction, that would withdraw all purchases in detail, made of individual *Indians*, from under the protection of the constitution. The whole article might be frittered away by this means. To construe the 37th article strictly by the letter would lead to very great absurdities;

ALBANY, Feb. 1823.

GOODELL v. JACKSON.

yet it is difficult to say, why we should adhere to the letter in one part, and not in another part of it. Thus, the prohibition is as to purchases of *the Indians within this state*. Literally, this would apply to the entire body of *Indians* collectively, of every nation and tribe; and we cannot reduce the prohibition from the *Indians* within this state to a part or portion of these *Indians*, without having recourse to a reasonable construction. So, also, upon a literal interpretation, any person might make a single purchase, for the constitution does not say, no purchase or purchases, contract or contracts, but is confined to the plural number, *no purchases or contracts*. But, whoever thought of subjecting to such a narrow, grammatical construction, a great constitutional charter, dealing only in general principles and bold outlines, and made for the noblest of moral and political purposes. Frauds are much more likely to happen in contracting with a single, half naked, unsheltered, and unprotected *Indian*, than with an assembly of grave chiefs, distinguished, not only for valour in war, but for wisdom in council. The constitution might, also, be easily evaded, upon this construction, by procuring a sale from the tribe to the individual, and then a sale from the individual to the whites.

In the plan of a penal code, lately submitted to the legislature of *Louisiana*, by an eminent jurist, and one of the native sons of this state, there is a declaratory article, that when the plural, *persons*, is used in a statute prohibition, the injunction applies to any one person doing the act; and that a prohibition as *to more objects* than one, includes the same prohibition as to a single one of the same objects. According to that rule, then, a prohibition to purchase from the *Indians* includes a prohibition to purchase from any of the *Indians*, and what commentary can make it plainer? Suppose the constitution had said, no fraudulent purchases from the *Indians* should be valid, would it not have reached a fraudulent purchase from a single *Indian*? Suppose it had said, that no robberies, or murders, should be committed upon the *Indians*, under pain of death, would it not have applied to a single robbery or murder? We ought to give to the words the sense most suitable to the

subject matter, and construe them largely and equitably in favour of the *Indians,* for whose protection they were intended. If the *Oneida* sachems, in council, had brought a complaint to us, that a member of their tribe, residing with them, and highly esteemed by them, had been defrauded by one of our people of his bounty lands, which his father had purchased from us by his blood, and they had pointed to our constitution, and asked if the legislature had authorized the purchase ; if we answered in the negative, but justified the purchase, on the ground that the constitution spoke of purchases from *Indians,* and not of a purchase from an *Indian,* would their untutored minds be able to comprehend the nicety of such a distinction, and the subtlety of such an interpretation ? Would they not say, or rather would not the world say for them, that we adhered to the letter and disregarded the spirit of the constitution ; that we acted almost as unreasonably as the *Roman* general, who concluded a truce with the enemy for thirty days, but ravaged their territory in the night, under the pretence that nights were not within the letter of the compact.

The rule for the construction of statutes, when words are used in the plural number, was well laid down by *Hales,* J. in a case in *Plowden.* (*Partridge* v. *Strange,* 1 *Plowd.* 86 *b.*) The statute of *Hen.* VIII. against selling pretended titles, spoke of rights and titles in the plural number ; that Judge said, " a pretended right and title in the singular number, is within the penalty of the statute, for the plural number contains in itself the singular number, and more." He referred, also, to the statute of 1 *H.* V., relating to those who forged false deeds and muniments, and observed, " that the statute speaks of false deeds in the plural number, yet, if a man forge one false deed, he shall be punished by the statute, as it is held in many books." Lord *Coke,* in his notes to *Littleton,* (*Co. Litt.* 369 *a.*) lays down the same rule of construction ; and where the statute speaks of rights in the plural number, any one right, says he, is within the statute.

But it is time to pass from the constitution itself to the consideration of the statutes made in pursuance of it.

In the winter of 1788, the attention of the legislature

was very thoroughly awakened to this subject, in conse-
quence of certain long leases which had been taken of the
*Indian* lands, and which the legislature, by concurrent re-
solution, declared to be infractions of the constitution, and
void. That occurrence led, in the first place, to the act of
the 1st of *March*, 1788, appointing commissioners to hold
treaties with the *Indians* within this state, and to inquire
and report touching purchases of lands suggested to have
been made without the authority or consent of the legisla-
ture, from the said *Indians*, or *any of them*, by any per-
son. Here was an act without any preamble or particular
reference to the constitution, assuming, as a matter of course,
that purchases from *any* of the *Indians*, without legislative
sanction, were void. The act of the 18th of *March*, 1788,
was passed, which recited, in its preamble, the 37th ar-
ticle of the constitution ; and, then, more effectually to
provide against infractions of it, 'the legislature declared,
that " if any person, unless under the authority, and with
the consent of the legislature, in any manner or form, or
upon any terms whatsoever, should purchase any lands
within the limits of this state, or make contracts for the
sale of lands within the limits of this state, with any *Indian*
or *Indians* residing therein, he should forfeit 100 pounds,
and be punished by fine and imprisonment. And if any
person entered upon, or took possession of, any lands within
this state, pretending any right therein, under colour of any
purchase from any such *Indian* or *Indians*, and not under
the authority, and with the consent of the legislature, he
should be subject to the like pains and penalties."

This act is very comprehensive in its terms. It applies
to the purchase of *any lands* of *any Indian* within this state,
without reservation or exception. I entertain no doubt,
the act, in all its extent, was well warranted by the 37th ar-
ticle of the constitution. Some of the most eminent ci-
vilians of that day, were in the legislature, at the time
of the passing of the act, and voted for the bill; (which
passed unanimously ;) and I consider the legislative con-
struction of the constitution, then given, as a very respecta-

ble, and a very commanding authority in the case.(a) If IN ERROR. ........ ALBANY, Feb. 1823. GOODELL v. JACKSON. the constitution had been really silent or doubtful on the subject, yet, the statute expressly reached the case of purchases from individual *Indians*; and, as Lord *Mansfield* observed, in *Pattison* v. *Bankes*, (*Cowp.* 543.) there are a variety of cases where it has been determined, that strong words in the enacting part of a statute, may extend it beyond the preamble. We have the rule laid down by the K. B. in *The King* v. *Athos*, (8 *Mod.* 144.) that the enacting clause may be applied to other mischiefs than those mentioned in the preamble.

This act, as it appears to me, puts an end to all further question touching the construction of the constitution; and, at any rate, the enacting clause puts an end to all pretence of validity in the claim of the defendant in error, under his unauthorized purchase from *William*, the *Indian*, in 1797.

It is probable, the convention, when they passed the article of the constitution under review, may not have anticipated the conveyance of lands from the whites to the *Indians*, as a probable event. But their provision did not, and ought not, to have rested upon the inquiry, from what source the *Indian* title was acquired. It was immaterial whether the *Indians* held their lands by immemorial possession, or by gift or grant from the whites, provided they had an acknowledged title. In either case, the lands were of equal value to them, and required the same protection, and exposed them to the like frauds. As early as the year 1788, individual *Indians* had acquired titles from the whites, and in *September*, 1788, we have the remarkable fact of the *Oneidas* ceding the whole of their vast territory to the people of this state, and accepting a retrocession of a part, upon restricted terms, and with permission only to lease certain parts for a term not exceeding twenty-one years. No one will pretend that these *Oneida* lands were not, after the cession, and retrocession, as well as before, within the protection of the constitution, and of the act of *March*, 1788.

Though I do not deem it requisite to go further, in order

(a) *Samuel Jones, Egbert Benson, James Duane,* and *Richard Harison,* Esquires, were members of the legislature when the bill passed.

IN ERROR.
·······
ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

to form a just conclusion upon the case before us, yet it will contribute to strengthen that conclusion, if we trace through succeeding statutes, the constant solicitude of the legislature to discharge their duty, as trustees to these *Indians*, by giving extraordinary protection to them against their own weaknesses, and against the superior address, intelligence, and activity of the whites.

By the act of the 22d of *March*, 1790, it was declared, that no person should maintain any action upon any contract to be made after the 1st of *July*, 1790, against any *Indian* residing upon any lands reserved to the *Oneida*, *Onondaga*, and *Cayuga Indians*. This act was passed several years before *Smith* made his purchase, and it certainly goes to render its validity very questionable, even if there were no other statute objections. The purchase was a contract made with an *Indian*, residing on the lands reserved to the *Oneidas*, and an action of ejectment is a mixed action, affecting not only the land itself, but the person claiming title. If the *Indian* was rendered incompetent to bind himself by a contract, upon which an action could be sustained against him, is it to be supposed that he was deemed competent for the most important of all contracts, the alienation of his lands? There seems to be a manifest inconsistency in the proposition, that a person is incompetent to make a personal contract, and yet is competent to make a contract binding *in rem ;* that he has capacity to convey, yet is not competent to warrant the title. But to proceed with the detail of the code of *Indian* statute law ; the act of the 11th of *March*, 1793, appointed agents on the part of this state, to make further purchases of lands of the *Oneida*, and other *Indian* tribes, and to propose to them that certain officers of government, and their successors, should be vested, as trustees for the *Indians*, with the property which they might choose to retain, in order to prevent any encroachments thereon, and to bring actions of trespass for the benefit of the *Indians*. By the act of the 27th of *March*, 1794, six persons, by name, were appointed trustees for the *Indians* residing within this state, and for each tribe, with power to make such agreements with the *Oneida*, *Onondaga*, and *Cayuga Indians*, respecting their lands, as should produce to them an annual income ; and every grant and con-

IN ERROR.

ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

veyance to be obtained from any of the said *Indians*, or nations, or tribes, was to be to the use of the people of this state. By the act of the 9th of *April*, 1795, commissioners were again appointed to make arrangements with those *Indians*, relative to their lands, parts of which they had, sometimes collectively, and sometimes individually, leased to the whites, under a prior authority, for terms not exceeding twenty-one years; and under which authority the present defendant in error is stated in the act to have obtained leases of the *Oneidas*. These commissioners were directed to agree with the *Indians*, to set apart lands for them, collectively, by tribes, or individually, by families, and such lands were to remain to them and their posterity unalienable, and without power to lease. The improvidence with which the *Indians* had used the power to lease, was, probably, the reason why it was so soon withdrawn from them; and by the subsequent act of the 1st of *April*, 1796, certain lands were to be quit-claimed to the *Oneidas*, under a stipulation that they were not to be sold or leased, without the express consent of the legislature.

All the statutes which I have hitherto noticed were passed prior to the purchase by *Smith*; and every one must have observed, with some degree of astonishment, the never ceasing anxiety of the legislature on the subject of purchases of *Indian* lands, and the great accumulation of provisions condemning the policy, declaring the injustice, and denying the validity of such purchases. There is, in the first place, the constitution itself, declaring all purchases of lands from the *Indians*, without the consent of the legislature, void. Then we have the act of the 1st of *March*, 1788, appointing commissioners to inquire whether any purchases of land had been made without authority of the legislature, from the *Indians*, or from any of them, by any person. Next, we have the act of the 18th of *March*, 1788, prohibiting, under heavy pains and penalties, any purchase of any lands, in any manner, or upon any terms, from any *Indian* or *Indians*, or from entering upon any lands under colour of any such purchase. Then comes the act of *March*, 1793, recommending to the *Indians* to consent, that some of our public officers should become their

IN ERROR.

ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

trustees, to secure their lands from encroachment and trespass. Next is the act of *March*, 1794, providing arrangements with the *Indians* to secure to them an annual income from their lands. Lastly, we have the act of *April*, 1795, recommending to the *Indians* to agree to have their lands set apart for them, collectively, or individually, and to be unalienable, without even the power of making short leases.

The acts which have been passed by our legislature, on the subject of *Indian* lands, since 1797, are well worthy of notice, as they throw light on those which preceded that period, and they are all to be taken and construed as being made *in pari materia*, and founded on the same principles, and animated with the same spirit.

The act of *March* 15th, 1799, considers the *Oneidas* as very defenceless ; and, in order to protect them from imposition, it directs the attorney of the district to advise and direct them in all controversies that may arise between the tribe, or any individual thereof, and any other person, and to defend suits instituted against them, and to institute suits for them, and particularly for trespasses committed upon their lands. The same protection was, afterwards, in 1806, extended to the *Onondagas.* Again ; the act of *April* 7th, 1801, prohibits the sale of ardent spirits to any *Oneida Indian ;* and any pawn taken therefor was recoverable back ; and, in 1817, it was made unlawful for a white person to receive a pawn or pledge, on any occasion, or under any pretence, from any *Indian* residing on the *Oneida* reservation. The act of *April* 4th, 1801, extended the inability to maintain actions against *Indians*, on contracts, to the *Stockbridge* and *Brothertown Indians*, and declared that their lands should be unalienable, and that even contracts between *Indians* themselves, relative to their undivided lands, should be void. The same inability to be sued, was extended, in 1807, to the *Senecas.*

Could any person, after reading all these provisions, have had any doubt, that an *Oneida Indian*, residing with his tribe, was not a person from whom a white could make a valid purchase. The legislature most clearly thought so, or they would not have passed the act of *March* 7th, 1809. That is the act under which *Miller*, the plaintiff in error,

claims to have made a valid purchase from *William*, the IN ERROR.
*Indian*, and there can be no doubt, that his purchase was
warranted by the act, and that he is entitled to hold the land ALBANY, Feb. 1823.
in question, unless *William* had lawfully parted with his
title in 1797.   The act declares, that every conveyance GOODELL v. JACKSON.
thereafter to be executed by the *Indian* patentee, or his heirs,
to any citizen of this state, should be valid, if executed with
the approbation of the Surveyor General.

The legislature very evidently understood, at the time,
that they were granting a right or power not then existing.
It was an act for the relief of the heirs of the *Oneida In-
dians*, to whom lands had been granted, and there was no sug-
gestion in it of any intention to confirm a right already exist-
ing, and which had been the subject of doubt.  It has none of
the features of a declaratory act; it is couched in the plain lan-
guage of the sovereign, creating right and conferring power.
We are authorized to consider the act as decisive evidence,
that the opinion of the legislature, in 1809, was in coinci-
dence with the opinion of the legislature in 1788, and in
favour of the construction that purchases of land from in-
dividual *Indians*, without express legislative sanction, were
unlawful and void.   On the 2d of *March*, 1810, a further
act was passed in relation to those heirs, enjoining spe-
cial care and diligence upon the Surveyor General, and
requiring him to ascertain that the conveyance was obtain-
ed fairly, and for a competent consideration, and that such
consideration had been paid and properly secured, before
he endorsed his approbation upon the conveyance.   So in-
cessant has been the paternal care of our rulers over these
*Indians*, and so demonstrable and so deep their conviction,
that the *Indians* do not deal on equal terms with the whites,
and have not the requisite discretion to make bargains for
themselves.

There are several acts which have been passed in favour of
particular *Indians*, by name, which I shall not stay to exa-
mine, for they afford no general conclusion one way or the
other.   They usually contained grants of land under consi-
derable restrictions, and with more or less caution and admo-
nition, as the particular case might seem to require.

IN ERROR.

••••••

ALBANY,
Feb. 1823.

GOODELL
v.
JACKSON.

My conclusion upon the whole case is:

1. That the patent to *John Sagoharase* and his heirs, was a patent to him and his *Indian* heirs, whatever their civil condition and character might be, whether aliens or natives.

2. That this patent is to be taken to have issued by due authority, and is equal to an express legislative grant of the lands to *John* and his *Indian* heirs.

3. That if the civil or political condition of the *Indian* heir was material in this case, as seems to have been held by the Court below, and by some of the counsel here, then my conclusion would be, that by our law he cannot be deemed a citizen.

4. That by the constitution and statute law of this state, no white person can purchase any right or title to land from any one or more *Indians*, either individually or collectively, without the authority and consent of the legislature, and none such existed, when the land in question was purchased by *Peter Smith*, in 1797.

I am, accordingly, of opinion, that the judgment of the Supreme Court is erroneous, and ought to be reversed.

*April* 1.

This being the opinion of the rest of the Court, (STRANA-HAN, senator, dissenting,) it was, thereupon, ORDERED, ADJUDGED, and DECREED, that the judgment of the Supreme Court be reversed, &c., and that the record be remitted, &c.

Judgment of reversal.