GRAY v. CLINTON BRIDGE. See Case No. 2,900.

## Case No. 5,714.

### GRAY v. COFFMAN.

[3 Dill. 393; 1 Cent. Law J. 326.][1]

Circuit Court, D. Kansas. 1874.

WYANDOT INDIANS — CONSTRUCTION OF TREATY—
INDIAN WILLS—DEVISE OF "FLOAT"—
DESCENT OF PROPERTY.

1. The treaty of March 17, 1842 (7 Stat. 608, § 14), and of January 31, 1855 (10 Stat. 1159), between the United States and the Wyandot Indians in respect to the grant to members of the tribe, of a right to select and locate a section of land, construed.

[Cited in Elk v. Wilkins, 112 U. S. 100, 5 Sup. Ct. 44; Wau-pe-man-qua v. Aldrich, 28 Fed. 498.]

2. The treaty of 1855 requires the patent to issue in the name of the reservee, though, if he be dead, the selection may be made by his "heirs or legal representatives," to be determined by the laws, usages and customs of the tribe. Whether a patent issued in the name of the heirs of the reservee is void, quaere?

[Cited in U. S. v. Payne, Case No. 16,014; Kennedy v. Indianapolis, C. & L. R. Co., 3 Fed. 100.]

3. A will of the right to this "float" made and executed according to the laws of the tribe, and proved and allowed by the proper tribunal of the tribe, is valid and will be respected by the civil courts. See Mackey v. Coxe, 18 How. [59 U. S.] 100.

4. Relation of the Wyandot Indians to the civil laws of the territory of Kansas, in respect to the disposition of property before and after the treaty of 1855, considered.

This is an action of ejectment [by Panela Gray against Jacob Coffman] for lands situate in Lyon county, in the state of Kansas. The case was tried upon testimony submitted

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

to the court, a jury having been waived. The evidence was voluminous, but the material facts sufficiently appear in the opinion of the court.

R. M. Ruggles and Clough & Wheat, for plaintiff.

Wilson Shannon, W. P. Montgomery, and E. S. Waterbury, for defendant.

DILLON, Circuit Judge. To determine the title to the land here in controversy involves the necessity of deciding several novel and highly interesting questions. The plaintiff claims title under a patent dated the 3d day of May, 1861. reciting the treaties of 1842 and 1855, below mentioned, between the United States and the Wyandot Nation of Indians, and which patent was issued to the heirs of John Hicks. John Hicks was a Wyandot Indian.

It is necessary briefly to refer to the history of the Wyandot tribe and of their removal to Kansas. In 1825 the Kansas Indians ceded, with the exception of a limited reservation, this country to the United States. 7 Stat. 244. In 1830 congress adopted the policy of causing Indian tribes residing east of the Mississippi to be removed to specified reservations west of the Missouri. 4 Stat. 411. The Wyandot Indians were the last tribe in Ohio which ceded their reservation in that state to the United States. This was done in 1842 by the treaty of Upper Sandusky, of March 17th of that year. 7 Stat. 608. By the 14th section of that treaty, the United States agree to grant to the above named John Hicks, to his heirs, and to thirty-five other specified persons of the Wyandot nation, one section of land each: "The land hereby granted is to be selected by the grantees, surveyed and patented at the expense of the United States, but never to be conveyed by them or their heirs without the permission of the president of the United States."

The next year, 1843, the Wyandot Indians, including John Hicks, removed to their reservation in Kansas. Here he lived with the tribe until 1853, when he died. On the 10th day of January, 1853, a short time before his death, he made his last will in writing. It was drawn up with all the usual formalities of such instruments, by Governor William Walker, an educated Wyandot Indian, attested by him and signed by the testator. The third clause of this will is in these words: "I will and bequeath unto my sons, Francis A. Hicks, and John Hicks, Jr. the section of land granted to me by the treaty of Upper Sandusky, dated March 17th, 1842." This instrument is produced and bears upon it this endorsement: "The within will and testament was read in open court, and allowed probate and ordered recorded. Wyandot Council, February 16th, 1853. John D. Brown. Principal Chief. Joel Walker, Clerk pro Tem."

It is indisputably established by evidence aliunde that the will was presented to the Wyandot council at that date, and was regularly allowed by it as the will of John Hicks, Sr. These devisees, John Hicks, Jr., and Francis A. Hicks, were the only living children of John, Sr. but there were then living grandchildren by two of his deceased children.

On the 31st day of January, 1855 (10 Stat. 1159), another treaty was made with the Wyandot Indians, which was ratified March 1st of that year. The first article states that "The Wyandot Indians having become sufficiently advanced in civilization, and desirous of becoming citizens, it is hereby agreed and stipulated that their organization and their relations to the United States as an Indian tribe, shall be dissolved and terminated on the ratification of this agreement, except so far as the further and temporary continuance of the same may be necessary in the execution of some of the stipulations herein; and from and after the date of such ratification the said Wyandot Indians, and· each and every one of them, except as hereafter provided, shall be deemed, and are hereby declared to be, citizens of the United States, to all intents and purposes; and shall be entitled to all the rights, privileges and immunities of such citizens and shall in all respects be subject to the laws of the United States and the territory of Kansas, in the same manner as other citizens of said territory; and the jurisdiction of the United States and of said territory shall be extended over the Wyandot country in the same manner as over other parts of said territory." Then follows a declaration excepting, for the time, from the· above provision as to citizenship, such Indians as may apply for it.

The treaty makes provision for the survey, platting and partition of their reservation, and for lists of the members of the tribe, divided into three classes: 1st, of those who are able to control and manage their affairs and interests. 2d, those who are not. 3d, orphans, idiots and insane persons. Lists of the second and third classes were to be furnished by the Wyandot council, under whose supervision and guardianship the treaty continues them.

The eighth article of the treaty defines the persons entitled to money and lands thereunder "to be such only as are actual members of the Wyandot Nation, their heirs and representatives, and as are entitled to share in the property and funds of the said Nation, according to the laws, usages and customs thereof."

Article 9, which is important, is in these words: "Each of the individuals to whom reservations are granted by the 14th article of the treaty of March 17, 1842 (of Upper Sandusky), or their heirs or legal representatives, shall be permitted to select and locate said reservations, on any government land west of Missouri and Iowa subject to pre-

emption and settlement; said reservations to be patented by the United States in the names of the reservees; and the reservees, their heirs and proper representatives, shall have the unrestricted right to sell and convey the same; but in cases where any of the said reservees may not be sufficiently prudent and competent to manage their affairs in a proper manner, which shall be determined by the Wyandot council, or where any of them have died, leaving minor heirs, the said council shall appoint proper and discreet persons to act for such incompetent persons and minor heirs in the sale of the reservations, and the custody and management of the proceeds thereof; the persons so appointed to have full authority to sell and dispose of the reservations, and to make and execute a good and valid title thereto."

On the 30th day of May, 1854—the year preceding this treaty—congress passed the act organizing the territory of Kansas [10 Stat. 277], but previous to this the public lands therein had been thrown open to preemption and settlement, and these Wyandot "floats," by which 640 acres could be secured for town sites, instead of 320 acres, were in great request. Francis A. Hicks, one of the devisees of the John Hicks "float," died August 16, 1855, a few months after the treaty of that year, leaving children and grand-children. He made a will on the 7th day of August, 1855, and therein directs "the one-half of the section of land willed to him by his father, under the treaty of March 17, 1842, to be sold, and the avails thereof to be applied to the liquidation of his debts and liabilities," and appoints Joel Walker his executor.

Now at the date of the death of Francis A. Hicks, on the 16th day of August, 1855, no statute of descent or wills had yet been passed by the territorial legislature of Kansas. The council still continued to act, and the will of Francis A. Hicks was admitted to probate September 25, 1855, the executor gave bond, and was authorized by the council to act as such. Subsequently, to-wit, January 5, 1863, the will was presented to the regular probate court of Wyandot county, and proved and allowed, but without any notice being published or otherwise given, so far as appears of record. Joel Walker, the executor of Francis A. Hicks, pursuant to directions in his will, sold the testator's undivided half of his 640 acre "float" to Jacob Ulrich for $1,000, and reduced the contract to writing. Ulrich located the float on the land in question, which was approved, and the patent issued, as above mentioned, May 3, 1861, "to the heirs of John Hicks," Sr. Subsequently, conveyance was made to Ulrich's estate, for this interest, and the heirs of Ulrich conveyed the land in question to the defendant.

The plaintiff claims a title through conveyance from grandchildren of John Hicks, Sr. who, if his will and the will of Francis A. Hicks are valid, had no title. In other words,

the right of the plaintiff to recover is based upon the proposition that these two wills are nullities; that, though made, executed and probated according to the laws, customs and usages of the Wyandot Nation of Indians, to which they belonged, these instruments have, in law, no legal effect in determining the rights of the parties.

The Wyandot Indians, before their removal from Ohio had adopted a written constitution and laws, and among others, laws relating to descent and wills. These are in the record, and are shown to have been copied from the laws of Ohio, and adopted by the Wyandot tribe, with certain modifications, to adapt them to their customs and usages. One of these modifications was that only living children should inherit, excluding the children of deceased children, or grand children. The Wyandot council, which is several times referred to in the treaty of 1855, was an executive and judicial body, and had power, under the laws and usages of the nation, to receive proof of wills, etc.; and this body continued to act, at least to some extent, after the treaty of 1855.

The first question arises under the patent. The treaty of 1855 required the patent to be issued in the name of the reservee. The patent of May 3, 1861, was in fact issued not to John Hicks, the reservee, but to the heirs of John Hicks. If it had been issued in the name of John Hicks, though he was then dead, it would, under the act of 1836, have inured to his heirs, devisees, or assignees. 5 Stat. 31. What is the effect of its being issued as it was to the heirs of John Hicks? The plaintiff contends that the patent was rightfully issued, and that under it the heirs of John Hicks take by purchase. That to ascertain who are his heirs, resort must be had, not to Indian laws, but to the laws of Kansas at the time, and that the legal effect of the patent is the same as if the children or heirs of John Hicks, Sr. had been named therein, which, if true, would cut off the rights of the creditors, devisees or assignees of John Hicks, Sr.

On the other hand the defendant insists, inasmuch as it is true, that if the patent is valid, the heirs of John Hicks take by purchase, that the patent is void because it was not issued, as the treaty specifically required, in the name of the reservee.

The issuing of a patent is a ministerial act, and a patent issued without authority is void. I am inclined to think that the departure of the patent in respect to the name of the grantee from the requirements of the treaty is material, and that the patent is therefore a nullity. The effect of this would be that the legal title is still in the United States, and, of course, the plaintiff could not recover in ejectment. But this point I leave undetermined, preferring to rest my judgment upon the ground that under the circumstances, the court must give effect to the well established laws, customs, and usages of the Wyandot tribe of Indians in respect to the disposition

of property by descent and will. John Hicks, Sr. had a valuable right given by the treaty of 1842—a right to select and locate 640 acres of land—not land but a "float," or right to land. He died in 1853, within the limits of what afterwards became the territory of Kansas. There is no national law of descent and wills, none regulating the rights of members of Indian tribes. The treaty of 1855 recognizes and provides in several places for the rights of heirs or legal representatives of the reservees under the treaty of 1842. These must mean heirs and legal representatives "according to the laws, usages and customs" of the tribe. See articles 8 and 9 of the treaty of 1855.

The government was aware that between 1842, when the right was given, and 1855, when the second treaty was made, that some of the reservees had died, and it provided carefully for this contingency by authorizing their heirs or legal representatives to select and locate the section of land. It is hardly possible to suppose that congress meant to refer to the law of Missouri territory of 1815, to ascertain who were the heirs or legal representatives of the deceased reservees. There is but one way to determine this, and that is by the laws, customs and usages of the tribe. If this is so, then the will of John Hicks, Sr. made and allowed in 1853, was valid and gave the right to his sons, John, Jr. and Francis A. If the will of the elder Hicks is valid, so likewise is the will of Francis A. whose death occurred previous to the enactment of any statute of wills or descents in Kansas, but after the ratification of the treaty of 1855. The dates are as follows: The treaty was ratified March 1st, 1855; Francis A. Hicks died August 16, 1855; the territorial statute of Kansas concerning wills was approved August 30, 1855 (Laws Kan. 1855, pp. 753, 761). The will of Franc's A. Hicks was admitted to probate by the Wyandot council Sept. 25, 1855. If the foregoing views are correct, the will of Francis A. Hicks was valid when he died, because it conformed to the laws and usages of his tribe, and there were no laws either of the United States or the territory of Kansas upon the subject.

Passing the question whether it is necessary to valid action by an executor under a will, that his appointment should be ratified by some court with probate powers, the only remaining inquiry would be, must Indian wills, after the ratification of the treaty of 1855, be presented to and allowed by the civil tribunals, before acts done thereunder and authorized thereby can be treated as valid?

Notwithstanding the broad language of the first article of the treaty of 1855 as to the dissolution of the tribal relation of the Wyandot Indians, and as to their becoming citizens of the United States and subject to its laws and the laws (prospective) of the territory of Kansas, it is evident from a view of the whole treaty that their property rights were regulated by it, and that the Wyandot council,

which was a tribunal with executive and judicial functions, was still to continue in force, at least for a time.

Francis A. Hicks died, leaving a will made and executed in due form, according to the laws of the tribe, before there were any laws of Kansas on the subject of the descent of property or of wills. The Wyandot council with jurisdiction over wills, continued to act. Wills which would be formal and valid by the laws or usages of the tribe, might be, and probably would be, informal when tested by territorial laws subsequently enacted. The foregoing views find strong if not, indeed, full support in the case of Mackey v. Coxe, 18 How. [59 U. S.] 100.

I am of opinion, therefore, that both wills are valid, and that the plaintiff, whose case rests upon the hypothesis of their nullity has no title to the land in controversy. Accordingly, there will be a judgment for the defendant. Judgment for defendant.

See Hicks v. Buttrick [Case No. 6,458], and Mungosah v. Steinbrook [Id. 9,924].