COMM'RS OF FRANKLIN CO., *et al.*, V. SARAH A. PENNOCK.

SAC-AND-FOX INDIAN LANDS; *Taxable, When Patented.* The lands belong-
ing to the mixed and half-bloods of the Sac-and-Fox Indians, residing in
Kansas, but who have tribal relations with the confederated tribes in the
Indian Territory, are taxable, and alienable, where the government has
issued to the allottees, under amended article 17 of the treaty of Febru-
ary 18th 1867, patents in *fee simple* therefor.

### *Error from Franklin District Court.*

INJUNCTION, brought by Mrs. *Pennock,* against the *Board
of County Commissioners,* and the county clerk of Franklin
county, and the holders of certain tax-certificates, to restrain
the issuing of tax-deeds for certain lands assessed and sold
for taxes, and to have said assessment and sales declared ille-
gal and void. Mrs. *Pennock* is a mixed, or half-blood Sac-
and-Fox Indian, a member by birth and blood, and from her
birth has been and now is in tribal relations with the confed-
erated tribes of the Sacs-and-Foxes of the Mississippi. Her
husband, Henry L. Pennock, is a white man, a resident of
the state of Kansas, and a citizen of the United States. In
the year 1870 the Sac-and-Fox tribe, under treaty stipula-
tions with the United States, removed from their reservation
in the state of Kansas to their new reservation in the Indian
Territory, where they have since remained, maintaining their
tribal organization. Mrs. *Pennock* did not remove with the
tribe to the Indian Territory, but remained, and is now with
her husband a resident of this state. A portion of the lands
described in her petition were allotted to her under the treaty
between the said tribe of Indians and the United States on
the 1st of October 1859, (proclaimed 9th July 1860,) and
the remainder were purchased by her from other mixed and
half-blood members of the same tribe between May 7th 1867
and May 30th 1868. These lands were first assessed for tax-
ation in 1871. The district court held that the lands were
not subject to assessment and taxation, and decreed a perpetual

injunction as prayed for, and the *Board of County Commissioners* and other defendants appeal, and bring the case here on error.

*H. B. Hughbanks*, and *H. C. Mechem*, for plaintiffs in error:

Mrs. Pennock contends that her lands are untaxable because they form part of the land originally in the reserve of the Sac-and-Fox tribe of Indians. There have been three treaties made, having provisions concerning these lands in them. The original creation of the Sac-and-Fox reserve in Kansas, was by the treaty of 1842, long before the territorial organization of Kansas. By it the body of land therein described, was "set apart as a perpetual home for the tribe." The title was in the condition commonly known as the "Indian title." The possessory right in the Indians — the fee in the general government. While it so remained, the territory of Kansas was organized, and in its organic act the rights of Indians then within its boundaries, and the power of the government to treat with them touching their lands, expressly saved. Of course they were untaxable, not because they were Indian lands, but because the ultimate title being yet in the United States. So they remained until the treaty of 1st October 1859. By this treaty the reserve was diminished to certain boundaries, and the remainder directed to be held in trust for the tribe and sold for its benefit. By the 10th article of the treaty it was recited that the tribe, being desirous to make some suitable provision for their mixed bloods, and such of their full-blooded women as had intermarried with white men, there should be allotted to such of them as desired it, 320 acres of the lands so cut off from the reserve. No provision was made for conveying to these assignees the title of the government, and a prohibition was laid upon them not allowing them to alienate to anybody except the general government and members of the tribe. The treaty made no provision for patents to issue, nor for any evidence of title other than the mere allotment. The title of such allottees differed from that of an ordinary Indian title only in

amount, and in being outside the new reserve, and was equally inalienable, without regard to the prohibition. This seems to have been done in view of the probability that ·at some time in the future, these persons allied by blood or marriage to the whites, would abandon their tribal relations. So the land remained untaxable, not by virtue of the fact that·it was an Indian allotment, but because the legal title still remained in the United States, which thus had the power to make it an Indian allotment. In 1867, the steady encroachment of the whites made it necessary for the tribe to remove to the common asylum for disinherited Indians, and they made a last and final treaty, so far as these lands were concerned, with the government, ceding to the United States a perfect and complete title to the diminished reserve, and to that portion of the old reserve which yet remained to be disposed of, excepting such grants as they therein made or rather directed the United States to make for them. The tribe were to remove beyond the state, and those who were therein provided for on the contingency of their acceptance, were to be severed from the tribe and their lot cast with the whites. They could no longer occupy their allotments and keep up their relations with the tribe. It was accordingly provided, that patents in fee simple should issue to such as had made their choice, to sever themselves from the tribe. No mere Indian title—no mere certificate or allotment, but a grant in fee simple, conveying all the title that could be conveyed. (17th Article, 15 U. S. Stat. at Large, 498.) These Indians did not take as Indians, but as donees of the Sac-and-Fox tribe. They took without any limitation, because the instrument making the grant contained none. The provision so made was undoubtedly made with a view to their remaining on these lands, and being merged in the white population about them; and of course it was necessary that their title be a fee simple, that they should be at liberty to exchange, or sell, or buy more, as Mrs. Pennock has done. The tribe has removed to·the Indian Territory, and these donees of the

tribe remain. They remain here not as an Indian tribe, but as part of our population, as residents of Kansas, responsible to her laws, entitled to her protection, and liable to the invariable price of such privileges, taxation. If it were otherwise, what an anomalous condition would be presented—the tribe has surrendered its reserve for a new one, and has removed to it, but has left here a dozen or twenty separate reserves of 320 acres of land each, over which (if they are reserves at all) the state of Kansas has no sort of control or jurisdiction, still subject to such rules and regulations as the United States may see fit to impose, touching trade and traffic. It is not such a case as that of the Kansas Indians, (5 Wallace, 537.) There the tribe remained in the state, upon its reserve, with its council and government, in a somewhat compact body, occupying somewhat contiguous territory. Here, (if Mrs. Pennock's land is exempt from taxation,) there are as many "reserves" as there are individual grants. But this is not the worst aspect of the case. Over these reserves the power of the tribe is gone absolutely. In the final treaty they reserved no shadow of authority. The only reserve which *they* as a tribe have any control over, is in the Indian Territory. Each of these Indian owners is for all purposes, a "tribe," on his or her "reserve." But not only is the authority of the tribe gone, but the general government has surrendered the power to treat concerning these lands with anybody, by issuing its patent in fee simple, conveying to the patentee every shadow of right or claim of every kind and nature which it ever did possess. It can no more exercise control over or interfere with the rights of these persons to these lands, or do any act changing in any way the relation which these lands are unto the state of Kansas, than it can do so with the lands of their neighboring white men who hold their land by a patent not one whit more comprehensive and effectual, and exactly similar, except that theirs import a money-consideration, and these a treaty-provision. Now if these lands *are* exempt from taxation, they must forever

remain so, as long at least as the present owners or their descendants occupy them. The power cannot be found to change without their consent, the nature and incidents of their title.

Again, if these lands possess any immunities or privileges, how many do they possess? If untaxable, are they not inalienable? Will not they follow the Indian law of descent, and what will that law be in the newly-fledged tribe, which in this case we may fitly designate as the Pennocks? All this may be as readily inferred from the treaty, granting these lands, as the immunity from taxation may be. There is no room to import into the treaty of 1867 the provisions of the treaties of 1842, and 1859. The purpose of the treaty of 1867 was not to change the character of the reserve, but to abolish it. Mrs. Pennock did not succeed, by her allotment, to "Indian rights," but to citizenship. Her case is exactly parallel with that of Petchico, in *Doe v. Wilson*, 23 How. 457. The treaties are in substance the same. The tribe was ceding its lands to the government, but directed that certain persons, among whom was Petchico, should receive donations, which subsequent to survey, were to be conveyed as these, by patent in fee simple. Before the survey, Petchico conveyed, and the court held the conveyance valid, saying that "the treaty converted the reserved sections (those donated to Petchico) into individual property," and this is in accordance with the decision of this court in *Krause v. Means*, 12 Kas. 335, which practically decides this case. We also refer to 9 Kas. 38, 477; 12 Kas. 32; 10 Ohio, 235; 16 Pet. 281; 4 McLean, 82; 31 Conn. 407; 10 Am. Law Reg. 493.

*Benson & Parkinson*, also for plaintiffs in error :

By the terms of art. 17 of the treaty between the United States and the Sac-and-Fox tribe, proclaimed 14th October 1868, (15 U. S. Stat. at Large, 495,) the restriction imposed upon the allottees under art. 10 of the treaty of 1860, was removed. The defendant in error then occupied the same relation to the lands allotted to her under the treaty of 1860, as though no such restriction had ever been in force. She

then held those lands, and which are described in the list of lands selected by the agent under art. 10 of the treaty of 1860, in fee simple absolute, divested of all burdens and restrictions whatsoever. For more than two years before the lands had been listed for taxation, she had held them without a single restriction, and under a title that had come into her hands without a shadow of immunity from taxation by treaty stipulations. The only reference to her, or to the class to which she belonged, and the only recognition of this class in the treaty of 1860, is comprised within the terms of art. 10. But for this recognition, this desire upon the part of the tribe proper to make "some suitable provision," etc., the defendant in error would have been landless, unless entitled to an eighty-acre tract under art. 2; and this was manifestly not the intention of the tribe. The only reference to this distinct class of mixed and half-bloods, and whole-blooded women who had intermarried with white men, in the treaty of 1868, is in art. 17, by which the lands of defendant in error were freed from all restrictions. The only plea, then, for the exemption of these lands from taxation and the ordinary burdens of government is, that the white blood of the owner is tinctured with that of the Sac-and-Fox Indian, and that she maintains a so-called "tribal relation" to a tribe of Indians located somewhere in the Indian Territory; and the further fact that a portion of these lands were patented to her by treaty stipulations, and the remainder purchased by her from others, who also maintained some vague and indescribable relation to the same tribe of Indians. Squaring this plea with the provisions of our constitution and statutes, and the well-settled rules of law governing the exemption of property from taxation, and how can the lands escape? The intention to exempt must, in every case, be expressed in clear and unambiguous terms. Taxation is the rule, exemption the exception. All exemptions are to be strictly construed. They embrace only what is within their terms. (Cooley on Taxation, 146.) This rule has many illustrations, and the liberal construction given to Indian treaties hardly forms an

exception. The questions decided in the case of *The Kansas Indians*, in 5 Wallace, are not decisive of the question involved in the case at bar. Here, there is no restriction in the patent under which the defendant in error holds, that had not been removed more than two years prior to the first assessment complained of; no question of whether the patentee has but a portion of the title, the remainder being in the government, and of the other provisions, restrictions and guaranties which, in the case of the Miamis, Shawnees and Weas, were construed by the United States supreme court as evincing a purpose upon the part of the Indian to shield himself from all the burdens which a full and unrestrained proprietorship in the soil imposes, and of the government in making good its promises and pledges of protection from the effects of these burdens. In both the treaty of 1860 and of 1868, is clearly manifested the same care in protecting the ignorant Sac-and-Fox against the rapacity of his more intelligent white neighbor, as in the case of the Miamis, Shawnees and Weas, discussed in the opinion referred to in 5 Wallace. The latter occupied substantially the same relation to their respective tribes, to the state of Kansas, and to the general government, as did the Sacs-and-Foxes on the diminished reserve in their treaty of 1860. In both cases there was a manifest intention and purpose upon the part of the Indian to invoke, and of the government to grant, all the protection necessary to secure the former in the enjoyment of his lands and his property; and hence the restrictions and guaranties — restrictions and pledges prominent only for their absence in the case of the mixed and half-blood Sac-and-Fox. To grant the immunity from taxation now sought by defendant in error, would be to bestow upon her a privilege evidently not thought necessary, and hence not contemplated by either white or Indian at the making of the treaties referred to. By her subsequent conduct and property acquisitions she has demonstrated an ability not only to retain what she had, but to be ever securing more, fully justifying the confidence

38—18 KAS.

reposed in her. And if her co-allottees under art. 10 of the treaty of 1860, have not justified the confidence reposed in their shrewdness and business tact, if they were induced to part with their possessions for a song, the defendant in error ought not to complain, for as to a good portion of these lands, and which are now held and claimed by her as exempt from taxation, she was the fortunate purchaser. She has been clothed with every right, and is bound to every duty of any other citizen of the state. Her lands are as productive, and just as free from restriction in their management, or sale, and there is no reason why they should not be taxed the same as the lands of any other citizen of the state.

But if our conclusion as to the liability to taxation of the lands held by defendant in error as *an allottee*, be incorrect, still we maintain that the lands held by her *as grantee* must be subject to taxation. If there be any exemption in either case, it is by reason of a personal privilege enjoyed by Mrs. Pennock. There is no exemption attaching to the land, qualifying the estate, and inuring to the benefit of all subsequent holders; 12 Kas. 114, 29 Wis. 383.

Such of the lands, then, allotted under art. 10, of the treaty of 1860, and described in the schedule attached to the treaty of 1868, as have since the date of the latter treaty come into the hands of white men, are properly subjected to taxation. And if in the hands of white purchasers, why not of Indian or half-blood purchasers, as well? When a white man buys land of an Indian he takes it subject to the ordinary burdens of taxation, notwithstanding it may have been exempt in the hands of the former. Does a different rule prevail when an Indian is the purchaser? There is certainly no peculiar sanctity about the trade and purchase of an Indian as to work and exemption from taxation of lands coming into his possession by purchase, simply because he is an Indian. Any personal privilege he may possess as to his allotment, does not follow him, working a like effect upon lands that he may purchase. He can be compelled to pay for lands in which

he may desire to invest, whatever his position in the tribe, or whether he resides upon a reservation or not; (*Rubideau v. Vallie*, 12 Kas. 28;) and why not to pay the taxes on them?

*John W. Deford*, for defendant in error:

The lands described in the petition are protected from state taxation, first, by the treaties between the Sac-and-Fox Indians and the United States, of 1842, and of 1859, and second, by the general principles of federal law governing the relations between the states and Indians resident therein. The lands in question are a part of the reserve granted to the Sac-and-Fox tribe, pursuant to the first clause of article 2 of the treaty of 1842, "for a permanent and perpetual residence for them *and their descendants.*" The broad shield, thus thrown over this entire reserve, still protects the property in dispute, which is a part of it, in the hands of Mrs. Pennock, one of the descendants of this tribe. No act of congress or treaty stipulation has ever amended or annulled it. The tax laws of Kansas cannot defeat or overturn it. Mrs. Pennock, and all her descendants, so long as they shall remain members of this tribe, recognized as such by the general government, will be entitled to hold every inch of these lands, however broad, under its protection. To this the public faith of the United States and of Kansas (Act of Admission, § 1, Gen. Stat. 66) is solemnly pledged.

Again, these allotments were assigned to Mrs. Pennock and her vendors, under and by virtue of article 10 of the treaty of 1859, which provides that "the lands granted by this article shall *remain inalienable,* except to the United States, or members of the tribe," etc. This clause, if still in force, is clearly fatal to any sale of these lands for state taxes; because thereby an alienation thereof to persons (*tax purchasers*) other than the "United States, or members of the tribe," would be effected. Has it, then, been repealed? "Yes," say plaintiffs in error, "by article 17 of the treaty of 1867, which directed 'patents in fee simple' to issue to the allotees." But repeals by implication are never favored,

especially in cases like this; and are not sustained in any case, except when necessary. "Again," says this court, in *Clark v. Libbey*, 14 Kas. 438, "it is said that patents are to be issued for these lands in fee simple, and this implies a full title, free from any restrictions upon alienation. This expression, at least when used in Indian treaties, carries no such necessary implication." Besides all this, by article 10 of the treaty of 1859, *the lands themselves* were not granted, but merely the ancient *Indian title*, or right of occupancy — the fee remained in the general government. Article 17 of the treaty of 1867 changed this into an absolute title. But article 18 declared that no sale should be made by or on behalf of the allottees, without the approval of the secretary of the interior — thus expressly perpetuating the guardianship of the federal authority over these people, and establishing a new barrier against any interference by the state with their allotments. And even if the force and effect of article 18 should be limited to the grantees named in articles 11 and 12 of the same treaty, the argument is the same, particularly as to Mrs. Pennock, who is one of the donees mentioned in article 11, (under her then name of "Sarah A. Whistler.") Article 20 of the treaty of 1867, *as it originally stood*, provided that "all treaties or parts of treaties heretofore made which conflict with the provisions of this treaty are hereby abrogated." But this entire article was afterward stricken out — a very clear indication that the makers of this treaty did not intend to alter or rescind any former treaty or part thereof, further than explicitly declared or absolutely necessary.

But even if the treaties were silent on the subject, the general principles of federal law, governing the relations between the states and Indians, would uphold the judgment of the court below. It is admitted that Mrs. Pennock is an Indian, and a member by blood, birth and descent of the Sac-and-Fox tribe, is in "*tribal relationship*," and receives annuities semi-annually from the United States. She is therefore entitled to all the privileges and immunities of an Indian,

however great her ability, wealth or accomplishments. So long as the federal government shall recognize her as an Indian, the state of Kansas must treat her and her property accordingly; (3 Wall. 407.) In the event of her decease, the probate court of Franklin county could not order a sale of a single acre of these lands, to pay the expenses even of her last sickness or burial; (15 Minn. 369.) Nor, do her rights "depend entirely upon the construction of the treaties between the United States and the Sac-and-Fox tribe of Indians." These Indians still retain their tribal organization, and national existence. As such, their property is exempt from state taxation. *The Kansas Indians*, 5 Wall. 737; *The New York Indians*, id., 761. "These decisions were placed *not simply or mainly* on treaty stipulations, but upon the broad ground, that these Indian nations were under the protection and care of the general government, were separate nations, and outside the jurisdiction of the states." (*Rly. Co. v. Morris*, 13 Kas. 315.) And see, 36 Ind. 310; 7 Yerg. 74; 1 Dillon Ct. Ct. 349; 29 Wis. 383; 23 N. Y. 420, 427.

The opinion of the court was delivered by

HORTON, C. J.: The sole question presented by the record in this case is, whether the lands belonging to the mixed or half-bloods of the Sac-and-Fox Indians residing in Kansas, but who have tribal relations with the confederated tribes of the Sacs-and-Foxes of the Mississippi, are taxable. The authorities of Franklin county assert the right, and the district court of that county having denied it, and having granted a perpetual injunction against certain tax deeds being issued embracing lands of the defendant in error, the question is properly here for consideration. The lands described in the petition were allotted to Mrs. Pennock, and her vendors, under article 10 of the treaty with the Sac-and-Fox Indians of 1st October 1859, (15 U. S. Stat. at Large, 470.) By virtue of the amended 17th article of the Sac-and-Fox treaty of 18th February 1867, (15 U. S. Stat. at Large, 498,) the lands

were conveyed to the allottees by the government by patents in fee simple. It is claimed on the part of the defendant in error, that the following provision of said article 10 of the treaty of 1859 exempts these lands from taxes, viz.: "The lands granted by this article shall *remain inalienable*, except to the United States, or members of the tribe." This court settled this question in *Krause v. Means*, 12 Kas. 335. In that case, it was held that by virtue of said amended 17th article of the treaty of 18th February 1867, "the restraint upon the alienation, imposed by the old treaty of 1859, was abrogated." In that case, Julia Goodell, a half-breed, and a member of the same Sac-and-Fox tribe, conveyed land allotted to her to one Mary A. Means. The opinion in that case fully covers the question in dispute. If the lands are not taxable, they cannot be conveyed except subject to the limitations of article 10 of the treaty of 1859. If such article is abrogated by the amended article 17 of the treaty of 1867, the lands are both taxable and subject to sale and conveyance to any person.

We do not now care to open the question anew. Rights of property have undoubtedly been acquired by various parties since the above decision was announced, which would be disturbed by an adverse ruling, and if any error has been committed by this court, the defendant in error can be fully protected in a case of this character on a review of our decision by the supreme court of the United States. We are of the opinion that " when the rules laid down by the courts become the laws which sustain titles and contracts, they are, in general, to be sacredly adhered to." *Church v. Brown*, 21 N. Y. 335. The learned counsel for the defendant in error participated in the argument in this court in the said case of *Krause v. Means*, supra, and then insisted here that "art. 10 ceased to operate in 1867, when the treaty of that year took effect," and that "ever since the United States conveyed the property in *fee simple* to Julia Goodell, and *a fortiori*, since it belonged to Mrs. Means, it has been subject exclusively to the laws of Kansas. (See brief, 12 Kas. 336.) If the argument presented

then by the counsel for the defendant in error in this cause was good law, and so this court assumed, it is equally applicable now.    To him, under the circumstances, the writer of this might well reply, that sometimes "even-handed justice commends the ingredients of our poison'd chalice to our own lips."    If it be claimed however, that the expression in *Clarke v. Libbey,* 14 Kas. 438, that "the issuance of patents for lands in fee simple, under the terms of an Indian treaty, does not necessarily convey an implication of a full title," sustains the present argument of the counsel for defendant in error, we answer, that not merely the provision for the patents to issue to the Sac-and-Fox half-breeds, by article 17 of the treaty of 1867, but the general object and purview of the entire treaty is in conflict with any idea that after such last treaty was proclaimed the lands allotted by article 10 of the treaty of 1859, and patented under article 17 of the new treaty, were to continue to be inalienable.    The purpose of the latter treaty was not to change the character of the reserve, but to abolish it as a reserve.    The object of the treaty was to remove the tribe from Kansas, and to furnish them homes in the Indian country.    A clause is contained in said treaty of 1867 to the effect, "that no part of the funds arising from, or due the nation, under this or previous treaty stipulations shall be paid to any band, or parts of bands, who do not permanently reside on the reservation set apart to them by the government in the Indian Territory, as provided in this treaty, except those residing in the state of Iowa."    In obedience to the obligations of this treaty, the tribe, numbering about one thousand, removed in 1870 from their reservation in this state to their new reservation in the Indian Territory, where they have since lived, maintaining their tribal organization.    Mrs. Pennock remained in Kansas, and is now with her husband, who is a white man, a resident of the state.    There is no longer any tribal organization of these Indians in our state—there are no chiefs here—no councils, and no stated meetings of the tribe.    All of this was anticipated in the treaty of 1867.    In pursuance of this result, the

government provided for the issuance of patents in *fee simple* to the allottees among the mixed, or half-blood Sac-and-Foxes, and by virtue of the said treaty of 1867, abrogated the restraint upon the alienation imposed by the old treaty. After the issuance of these patents, the lands therein conveyed were alienable, and taxable, in the full meaning these terms imply.

The judgment will be reversed, and an order will be directed to the court below to dissolve the injunction heretofore allowed, and to enter judgment in favor of plaintiffs in error for all costs.

All the Justices concurring.