WAU-PE-MAN-QUA, *alias* MARY STRACK, *v.* ALDRICH.

*(Circuit Court, D. Indiana. 1886.)*

1. JURISDICTION—FEDERAL QUESTION—TAXABILITY OF INDIAN LANDS—ORDINANCE OF 1787, AND TREATIES WITH THE MIAMIS.
It is a federal question whether or not, by force of the ordinance of 1787, and of treaties with the Miami Indians, certain lands in the possession and ownership of a Miami chief and his descendants were exempt from taxation.
2. SAME—LANDS EXEMPT.
*Held,* that the lands patented to Jean Baptiste Richardville, in pursuance of the third article of the treaty of St. Mary's, signed October 6, 1818, by force of that and later treaties with the Miamis, and of the ordinance of 1787, were exempt from taxation, and remained exempt while in the possession of his descendants, whose tribal relation had not ceased.

In Equity.

*Charles L. Holstein, Colerick & Oppenheimer,* and *S. R. Alden,* for complainant.

*Morris, Aldrich & Barrett,* for defendant.

Action to quiet title to land. The defendant claims under a tax sale, and the controlling question in the case is whether or not the land in question was subject to taxation by the local authorities of the

state.   The pertinent averments of the bill in this respect are to the following effect:

That Jean Baptiste Richardville was a member and the principal chief of the Miami Nation of Indians, and, prior to 1818, had, with the consent of his nation, taken exclusive possession of certain lands theretofore owned by the tribe, including three sections described in the third article of the treaty of October, 1818, between the United States and the Miami Nation, and that by that treaty the United States released to Richardville all its claim of right, title, or interest in the said three sections.   That by section 14 of the treaty of November 6, 1838, the United States granted to Richardville and his family the privilege of remaining in Indiana when the tribe should remove from the state.   That from the time when, with the consent of his tribe, he settled upon the same, Richardville remained in the undisturbed possession and ownership of the three sections aforesaid until his death, in 1841, without any claim or assertion of interest in or sovereignty over the same by the United States, or by the state.   That by his last will, duly probated on the twenty-seventh day of August, 1841, Richardville devised these lands to his daughter, La Blonde, who died in 1847, having devised the same to her son, Ke-la-ke-wa-ke-ah, and her daughter, Mon-go-se-quah, by a will which was duly probated on the first day of June, 1847; and Ka-la-ke-wa-ke-ah, dying in ——, left his po₃tion to his sister and his son, Me-che-ke-no-quah; and, they having made partition, Mon-go-se-quah gave and conveyed to her daughter Lau-da-nagis-sau-qua, *alias* Katherine Godfrey, 120 acres of her portion of the land, known as lot 3 of the subdivision of the Richardville reserve, and also to her daughter Sa-ca-cha-qua, *alias* Mary Strack, 82 acres thereof, known as lot 1 of said subdivision. That Katherine Godfrey and Mary Strack have died; and that, being a daughter of the said Mary, the complainant is owner, by descent, of the seventh undivided part of said lot 1, and of an undivided interest in lot 3.   That since 1812 said lands have been owned by and in the possession of complainant and her said ancestors, all of whom continuously were, and such as are living are and have been always, members of the Miami tribe of Indians.   That they have all resided on said three sections, and continuously have sustained their tribal relation to the United States as members of the Miami tribe from 1812 to the present time, making treaties from time to time with the United States, and, since the removal of the main portion of the tribe from Indiana, communicating with the United States through agents of the United States appointed for that purpose, and in like manner receiving moneys due them under treaties, and reporting their condition, and changes in their number by death and birth; none of them ever having become citizens of the United States, or of the state of Indiana.   That prior to 185— no taxes were imposed upon said lands, but since that time pretended assessments have been made; and, at a sale for delinquent taxes, in 1879, the defendant became purchaser, and afterwards received a tax deed, under which he claims title or interest.

The bill also contains references to the ordinance of 1787, and to the provision in the constitution of Indiana in respect to that ordinance; and, by virtue of these, and of the treaties between the United States and the Miami Indians, the complainant insists that these taxes were all illegal, and the tax sale a nullity.

The defendant has presented a plea to the bill, which embraces three propositions, each advanced as a defense:   The first is to the effect that the court has no jurisdiction of the parties and subject-matter of the action.   The second, that there is another suit pending in the state court, commenced against the complainant's mother and

others before this suit was begun, and that the death of the mother had been suggested in that court before this bill was filed.  The third is directed to the question of the taxability of the land in suit, and consists of averments, affirmative and negative, to the effect following:

That the lands were taxable because, on the fourth day of September, 1823, they were, by patent by James Monroe, the president of the United States, conveyed to said Jean Baptiste Richardville in fee-simple, with full and unlimited powers of alienation, pursuant to the first clause of the third article of the treaty of 1818; that from that time until his death, in 1841, Richardville, as the individual grantee of the United States, by virtue of said grant, by treaty and patent, held and occupied the land; that upon his death his daughter and devisee caused his will, under which she derived title, to be duly proved before the probate court of Allen county, Indiana, and in turn her will was also probated in said court, and afterwards, to-wit, October 19, 1854, partition was had in the common pleas court of said county, in an action duly brought therein, and said land has passed by will, deeds, and decrees of court, all under and pursuant to the laws of Indiana, to its present owners, against whom the defendant is prosecuting his suit in the superior courts of said county.  "And the defendant denies that Richardville, or any of his devisees, grantees, successors, or assigns, ever used or occupied said lands, or any part thereof, as members of the Miami Nation of Indians, or that the government has ever recognized or treated with any of said heirs or devisees of said Richardville as members of said Miami Nation, and denies that there is now any such nation or tribe recognized by the United States; and says that said Richardville was allowed to remain in the state of Indiana on account of his age and infirmities, and that from that time to his death no relations, official or otherwise, were maintained or kept up between him and the Miami Nation, and that his descendants, including the complainant, her parents, and co-tenants, have had no connection with that nation, nor have they been governed by, nor in any way conformed to, the laws, usages, and customs thereof; but, on the contrary, have mingled, associated, and transacted business with the white citizens of the state as with each other, appealing to and recognizing, in criminal as well as in civil affairs, the jurisdiction of said state over their persons and property, celebrating their marriages in conformity with the laws and usages of the state; that the male descendants of Richardville have, when of lawful age, all voted at elections, township, county, state, and national, and have always, until about the year 1860, acquiesced in the view that said lands were taxable, and prior to that time paid all taxes assessed thereon."

The following are relevant treaty provisions:

By the treaty of St. Mary's, signed October 6, 1818, the Miamis ceded to the United States a tract of land near Ft. Wayne, excepting certain portions reserved for the use of the nation; and by the first clause of the third article of the treaty the "United States agree to grant by patent, in fee-simple, to Jean Baptiste Richardville, principal chief of the Miami Nation of Indians," nine sections, including the three aforesaid, which are described in this wise: "Beginning about twenty-five rods below his house, on the St. Mary's river near Ft. Wayne; thence [westward] at right angles with the course of the river, one mile; and from this line and the said river, up the stream thereof, for quantity."  And by the same article the "United States also agrees to grant to each of the following persons, being

Miami Indians by birth, and their heirs, the tracts of land herein described;" and here follow the names of 20 or more persons, to whom are allotted in the aggregate 40 or more sections of land. By the fifth article, the United States agrees to pay to the Miami Nation a perpetual annuity of $15,000, to build for them "one grist-mill and one saw-mill at such proper sites as the chiefs of the nation may select, to provide and support one blacksmith and one gunsmith for them, to furnish them with such implements of agriculture as the proper agent may think necessary, and cause to be delivered annually to the nation one hundred and sixty bushels of salt." By the sixth article, the lands which by the third article the United States agreed to grant, except the tracts to be granted to Jean Baptiste Richardville, were never to be transferred by the persons named, or their heirs, without the approbation of the president. 7 St. at Large, 189.

By the treaty of October 23, 1826, (Id. 300,) the Miamis made a further cession of territory north and west of the Wabash and Miami rivers and of the cession of 1818, excepting certain reservations. By the third article of this treaty separate tracts of land are to be granted to persons named in a schedule, including John B. Richardville, to whom is given three and one-half sections, which are not to be conveyed without the consent of the president. By this treaty the United States, besides other obligations similar to those in the former treaty, agrees to "cause to be built a house, not exceeding the value of six hundred dollars," for each of nine persons named, including Richardville, who is one of the signers of the treaty.

The next treaty of any significance here was made at the Forks of the Wabash, October 23, 1834. Id. 458. By the fourth article it is agreed that "a patent in fee-simple shall be issued by the president to John B. Richardville, principal chief of the Miami tribe, for a *reserve* of ten sections made to said tribe by the treaty of 1826;" and, by the third article, provision is made for a grant to him and his heirs, (he being described here also as principal chief of the tribe;) and, by the fourteenth article, *patents in fee-simple* are to be issued to individuals named, for lands granted to them by the treaties of 1818 and 1826. Richardville does not appear to have signed this treaty in its final shape, but did sign the original draft, and the subsequent articles of agreement for its modification dated July 31, 1837.

By the treaty of November 6, 1838, (Id. 569,) the nation made another cession, from which a reservation was made "for the band of Me-to-sin-ia," and stipulations were entered into for the removal of the tribe beyond the Mississippi river; but by the fourteenth article it is provided that "whereas, John B. Richardville, the principal chief of said tribe, is very old and infirm, and not well able to endure the fatigue of a long journey, it is agreed that the United States will pay to him and his family the proportion of the annuity of said tribe which their number shall indicate to be due them, at Ft. Wayne,

whenever the said tribe shall emigrate to the country to be assigned them west as a future residence." This treaty contains other provisions for the personal benefit of Richardville, and other members of the tribe named in a schedule. The right to share in the annuities agreed to be paid is expressly limited to members of the tribe, and such other persons as shall have been, by general council, adopted into the tribe. This treaty also is signed by Richardville.

By the treaty of November 28, 1840, (Id. 582,) the Miami tribe ceded to the United States "the residue of the 'Big Reserve,'" recited as "being all of their remaining lands in Indiana;" and in consideration therefor the United States, besides the provisions for the benefit of the tribe and other individuals, agreed that there "be granted and reserved to John B. Richardville, principal chief, seven sections of land from the land ceded in the first article of this treaty, at such point or points as he may select, (not less than one section at any point,) to be conveyed to him by patent from the United States;" and further stipulated that there be paid to him the sum of $25,000. It was also stipulated that the United States should convey to Me-shin-go-me-sia, son of Me-to-sin-ia, in trust for his band, the tract of land reserved by the second article of the treaty of 1838; and that the same provision, made in favor of Richardville and family in the fourteenth article of that treaty, be granted and extended to Me-shin-go-me-sia and his brothers. It is further provided that the tribe shall remove to the country assigned them in the west within five years from the date of this treaty, and that nothing in this treaty is to be construed as impairing former treaty stipulations not altered by or coming within the purview of any provision of this treaty.

By the treaty of June 5, 1854, (10 St. 1099,) the United States undertakes to hold and invest for the Miami Indians of Indiana the sum of $231,000, and pay them annually 5 per centum interest thereon for 25 years, and at the end of that period to pay them the principal sum: "provided that no persons other than those embraced in the corrected list, agreed upon by the Miamis in the presence of the commissioner of Indian affairs in June, 1854, comprising three hundred and two names as Miami Indians of Indiana, and the increase of the families of the persons embraced in said corrected list, shall be recipients of the payments, annuities, commutation moneys, and interest hereby stipulated to be paid to the Miami Indians of Indiana, unless other persons shall be added to said list by consent of the said Miami Indians of Indiana, obtained in council, according to the custom of the Miami tribe of Indians." Throughout this treaty the distinction between the Miamis in the west and the Miamis of Indiana is kept clear, and the tribal relations of both are recognized as still existing, and as expected to continue for at least a quarter of a century longer; and, in accordance with this treaty, congress has made annual appropriations out of which the interest and stipulated annuities were regularly paid until 1881, when, the principal sum

having become due, an appropriation was made for its payment by the act of March 3d, wherein provision is made for the enumeration of the persons entitled to receive the fund; the enumeration to be based upon "the corrected list" agreed upon in June, 1854, and referred to in the treaty of that year.

By the preamble to the first constitution of Indiana, framed in compliance with the enabling act of congress, approved April 19, 1816, the ordinance of 1787 for the government of the Northwest Territory was continued in force. The third article of that ordinance has this clause:

"The utmost good faith shall always be observed towards the Indians. Their lands and property shall never be taken from them without their consent; and in their property rights and liberty they shall never be invaded or disturbed, unless in just and lawful wars authorized by congress; but laws founded in justice and humanity shall from time to time be made, for preventing wrongs being done them, and for preserving peace and friendship with them."

Since 1843, if not from an earlier date, there has been among the statutes of this state the provision that "all lands reserved to or for any individual, by any treaty between the United States and any Indian tribe or nation, shall be liable to taxation from the time such treaty shall have been confirmed."

WOODS, J., *(after making the foregoing statement.)* The plea fails to show that the state court acquired jurisdiction of the person of the complainant's mother, and thereby a right to revive the action against the complainant. There is therefore no conflict of jurisdiction between courts; and, in the other respect suggested, there is no lack of jurisdiction in this court, because, plainly, the case presents a federal question; namely, the question embodied in the third proposition of the plea now to be considered.

In view of the facts recited, resting, as they do, in public treaties and acts of congress, of which the court takes knowledge, and notwithstanding the not very explicit denials of the plea, it seems clear that the complainant's ancestors, from whom she derived title and possession of the lands in dispute, were all Indians of the Miami tribe, and never lost their character as such; but, on the contrary, remained, in some degree, under the control and guardianship of the national government. They have lived upon the land secured to them by the treaties, as it was contemplated and stipulated they should, without loss of the right to share in the common benefits bestowed upon or belonging to the tribe. The natural consequence, as the country became settled, was that they should live among, and should avail themselves to some extent of the laws and customs of, the whites, as alleged in the plea; but it by no means follows that they have lost the rights incident to their tribal relation and character. The decision in the *Case of the Kansas Indians,* 5 Wall. 737,

as it seems to me, puts this at rest; and, if the lands in suit were subject lawfully to the assessments for which they were sold, it must be, as the defendant contends, because these particular lands, besides having been patented to Richardville in fee-simple, were excepted from the restriction, imposed by the treaty upon other private grants, against conveyance without the approval of the president. Save in this particular, I see no ground for distinguishing this case from that of the *Kansas Indians*, unless, indeed, it be for reasons more favorable to the complainant here.

It is claimed, however, that the distinction suggested is made and established by the decision in the case of *Pennock* v. *Commissioners, etc.*, 103 U. S. 44. That case, however, does not, I think, go so far, nor proceed upon ground so narrow. On the contrary, it turns upon the interpretation and construction of different articles of the treaty then considered; if, indeed, it may be said there was room for interpretation. By express terms, the lands allotted or assigned under the first five articles of that treaty, in 80-acre lots, to individual members of the tribe, were to be free from taxation, levy, sale, or forfeiture until otherwise provided by congress; but by the tenth article, relating exclusively to "mixed and half-breeds," or women of the whole blood, who had intermarried with white men, tracts of 320 acres were assigned to each person taking under that article; and it is held that "these parties, by accepting the grant of the tenth article, were excluded from the benefits, and freed from the restrictions, of the other articles, except as they were repeated in it." In the tenth article there is no repetition of the exemptions from taxation, levy, etc., and therefore, quite inevitably, it was held that land taken under that article by a woman of the whole blood, who had remained with her white husband upon the land, though still keeping up relations with her tribe, which had removed from the state, was subject to taxation by the state. The restriction upon conveyance, found in the eighteenth article of the treaty, was held not to apply to lands assigned under the tenth article; and this fact, with others, was noted in the opinion as distinguishing the case from that of the *Kansas Indians*, but there is nothing to warrant an inference that the court intended to imply—it certainly did not decide—that land owned in fee-simple by an Indian, which otherwise would be exempt from taxation, will be deemed subject to assessment merely because it is free from restriction upon the power of alienation. On the contrary, the opinion seems rather to indicate, in its conclusion, that the right of exemption from taxation rests on the fact of a continued tribal organization in the state, which the United States has recognized by treating with the persons concerned as distinct political communities; and, this being so, it is established by the decision in respect to the Kansas Indians that the individual members of a tribe may enjoy the same immunity, in respect to lands held in severalty, as the tribe, in respect to those held in common, though the individual

holdings be not contiguous to the tribal lands or residence, and though the owners dwell among the whites, conforming largely to their customs and laws, to the corresponding neglect of the habits and usages of their own people.

There seems to me to be no reason, speaking generally, why the unrestricted right to alienate should make Indian lands taxable which otherwise would not be; and, looking at the facts of the particular case before the court, I think it would be quite unreasonable, if not, indeed, absurd, to give to that fact controlling significance. Richardville was the principal chief of his tribe, entitled to distinction as such, and in every treaty made during his life this fact receives substantial and conspicuous recognition. In the treaty of 1818 an especial acknowledgment of his rank was given by excepting the lands which were to be patented to him from the limitation declared in respect to the lands which were reserved for or to be conveyed to other individual Indians. That this was meant, in part, as a personal concession and honor to Richardville as principal chief—quite inconsistent with the idea that *thereby* the lands became at once subject to taxation and the like civilized servitudes—was so evident and well understood that, if any suggestion to the contrary was ever made, it was not acted upon during Richardville's life, nor for more than a decade after his death. Conceded, therefore, as I think it must be, that, while in possession of the principal chief of the tribe, the land was exempt from assessment, it must be held to have remained so in the possession of his devisees and descendants, members of the tribe, so long as they continued to hold, and were recognized by the United States as holding, that relation; and this, as we have seen, was done until after the sale for taxes under which the defendant asserts his claim. Indeed, without proof or averment to the contrary, it may be presumed that upon the "corrected list" referred to in the treaty of 1854 appear the names of complainant's ancestors who survived that date; and her own name, if not of the original number, it may be supposed, was added afterwards. But whether this was so or not, and whether or not she is an Indian, or, as the defendant asserts, is bound by the *status* of her father, rather than that of her mother, and is therefore a citizen by birth, it is immaterial to inquire; because, if the tax levies were unlawful as against the mother, the daughter and heir, though herself a citizen, and entitled in her own right to no immunity from taxation, may have the sale annulled.

It is to be observed that the cases decided by the supreme court had reference to lands in the state of Kansas, and were therefore in no sense affected by, and throw no direct light upon, the proper application, to a like question, of the ordinance of 1787 in territory where it has force. But the decisions do afford some aid in this direction, because in respect to one of the tribes of the Kansas Indians there was a treaty stipulation that their lands should not be liable to "levy, sale, execution, or forfeiture;" and this was held "to

prevent a levy and sale by officers of the state for taxes, as well as a levy and sale under judicial proceedings;" reversing, in this respect, the decision of the supreme court of Kansas, and following, or rather applying, the rule declared by Chief Justice MARSHALL in *Worcester* v. *Georgia*, 6 Pet. 581, where he says:

"The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import as connected with the tenor of the treaty, they should be considered as used only in the latter sense."

By the same rule of construction, the words of the ordinance, "The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent,"—clearly exclude any reasonable pretense of right in the state to sell or forfeit the lands of Indians for non-payment of taxes. That the ordinance has this force was distinctly recognized by the supreme court of Indiana in the case of *Me-shing-go-me-sia* v. *State*, 36 Ind. 310, wherein it was held that the lands patented to Me-shing-go-me-sia in trust for the band of Me-to-sin-ia, in conformity with the treaties of 1838 and 1840, *supra*, were not taxable.

Reference has been made by the defendant, in this connection, to the declaration found in *Langford* v. *Monteith*, 102 U. S. 147, to the effect that, without some clause or language to the contrary in a treaty with Indians with respect to a reservation within the exterior limits of a territory, (Idaho,) "the lands held by them are a part of the territory, and subject to its jurisdiction, *so that process may run there*, however the Indians themselves may be exempt from that jurisdiction." The italicized clause, it must be observed, qualifies the entire proposition; and so, doubtless, it has always been competent for Indiana to send its officers, with process, criminal or civil, into the reservations and lands of the Miamis within its borders, whether held by the tribe or by individuals, and, possibly, to exercise police powers over the Indians themselves to some extent. This much, it would seem, is within the scope of the last clause of the third article of the ordinance of 1787, already quoted, (see *Goodell* v. *Jackson*, 20 Johns. 715; *Utah & N. Ry. Co.* v. *Fisher*, 116 U. S. 28; S. C. 6 Sup. Ct. Rep. 246;) but quite different, and by no means necessarily implied, would be the right to levy taxes, or to impose other pecuniary burdens, which might work a forfeiture or affect substantially the Indian right of exclusive and free enjoyment.

Besides the decisions referred to, the defendant has cited, in support of his positions, the following: *Pka-o-wah-ash-kum* v. *Sorin*, 8 Fed. Rep. 740; *Lowry* v. *Weaver*, 4 McLean, 82; *Swope* v. *Purdy*, 1 Dill. 349; *Hilgers* v. *Quinney*, 51 Wis. 62; S. C. 8 N. W. Rep. 17; *Quinney* v. *Stockbridge*, 33 Wis. 505; *Commissioners, etc.*, v. *Pennock*, 18 Kan. 579, and earlier cases of that state; *Frederickson* v. *Fowler*, 5 Blackf. 409; *State* v. *Commissioners, etc.*, 63 Ind. 497. But, in so far as they are consistent with the decisions of the federal supreme

court, these cases are broadly distinguishable from the one under consideration.

For instance, the decision in *Hilgers* v. *Quinney* is placed explicitly on the ground that the Indian who claimed exemption from taxation had become, and had been recognized as, a citizen of the state by both the state and federal governments,—so recognized by the state in the very statute which required the levying of the disputed taxes.

In *Goodell* v. *Jackson, supra*, at page 723, Chancellor KENT says:

> "The government of the *United States* had, in the earliest and purest days of the republic, watched with great anxiety over the property of the Indians intrusted to their care. It must have been immaterial from what source the property proceeded, and whether it was owned by tribes or families or individuals. *If it was Indian property in land*, it had a right to protection from us as against our own people."

And much clearer and stronger is the proposition when applied to this case, where the land was not obtained by purchase, had never belonged to the whites, but had been set off to the chief by his tribe as his own; and, though afterwards ceded to the national government, it was done by a treaty which bound the United States to make reconveyance; so that, if this temporary lodgment of the naked legal title in the United States originated in any other design and consideration than mere formality and convenience, it would seem rationally to have been for the purpose of pledging the good faith and authority of the government to the protection of the grantee and his descendants in the ownership so granted and confirmed. If it had been intended that the Miamis permitted to remain in Indiana should, by remaining, become citizens and subject to the jurisdiction of the state, that intention would have been expressed in some of the treaties, as in similar cases it was done in treaties with other tribes.

In the case of *Elk* v. *Wilkins*, 112 U. S. 100, S. C. 5 Sup. Ct. Rep. 41, the supreme court said:

> "The alien and dependent condition of the members of the Indian tribes could not be put off at their own will, without the action or assent of the United States. They were never deemed citizens of the United States, except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens on application to a court of the United States for naturalization, and satisfactory proof of fitness for civilized life; for examples of which see treaties in 1817 and 1835 with the Cherokees, and in 1820, 1825, 1830, with the Choctaws, (7 St. 159, 213, 236, 335, 483, 488; *Wilson* v. *Wall*, 6 Wall. 83; *Opinion of Atty. Gen. Taney*, 2 Op. Attys. Gen. U. S. 462;) in 1855 with the Wyandotts, (10 St. 1159; *Karrahoo* v. *Adams*, 1 Dill. 344, 346; *Gray* v. *Coffman*, 3 Dill. 393; *Hicks* v. *Butrick*, 3 Dill. 413;) in 1861, and in March, 1866, with the Pottawatomies, (12 St. 1192; 14 St. 763;) in 1862 with the Ottawas (12 St. 1237) and the Kickapoos, (13 St. 624;) and acts of congress of March 3, 1839, (chapter 83, § 7,) concerning the Brotherton Indians; and of March 3, 1843, (chapter 101, § 7,) August 6, 1846, (chapter 85,) and March 3, 1865, (chapter 127, § 4,) concerning the Stockbridge Indians, (5 St. 351, 647; 9 St. 55; 13 St. 562.) See, also, treaties with

the Stockbridge Indians in 1848 and 1856, (9 St. 955; 11 St. 667; 7 Op. Attys. Gen. U. S. 746.)"

It seems clear from this quotation that if the male descendants of Richardville have been voting, they have done it without right; and, in any view, their acts and their *status* probably can have little or no bearing upon the rights of complainant and of those from whom she obtained title.

In *Given* v. *Wright,* 117 U. S. 648, S. C. 6 Sup. Ct. Rep. 907, it is held that a long acquiescence in the imposition of taxes may raise a presumption of a surrender of the privilege of exemption.

Perhaps, by answer, the defendant may be able to show that, at some time before the assessment of some or all of the taxes in question, the Indian right of immunity from taxation ceased. The plea, if not open to the charge of duplicity and multifariousness, I am convinced falls short of showing any defense to the bill, and is therefore overruled.

Justice HARLAN has expressed his concurrence in the following letter:

"WINCHESTER, VA., August 14, 1886.

"DEAR JUDGE: I have carefully examined your opinion in the *Indian Case,* and also the brief of counsel for the defendant. Upon the facts stated, including the provisions of the several treaties to which you refer, your conclusion seems to be sound. While these Indians, according to the plea, have exercised some rights that belong to State citizenship, the papers sent to me do not show that the United States had, prior to the tax sales in question, surrendered control over them *as Indians,* and as, in fact, a part of the tribe to which they originally belonged. It does not seem to have been the object of any of the treaties to separate them, for every purpose, from their tribe, and abandon them to the absolute control of the state in which they were permitted to remain. On the contrary, the relations between them and the United States, at the time of the tax sales, seem to have been such that the government could have compelled them to join their tribe wherever it then was. It was competent for the United States to retain control equally over those who went to the west, and those who, for special reasons, were permitted to remain in Indiana.

"It seems to me that you correctly interpret the decisions of our court, and that there is no escape from the conclusion reached by you. These lands ought now to be subjected to taxation, but the way should be opened by legislation upon the part of congress.

"The answer, as you suggest, may show a state of facts that will justify or sustain the claim of taxability; but, upon the present showing, the plea should not be allowed. * * *

"Yours, truly, JOHN M. HARLAN.

"*To Hon. W. A. Woods.*"